Federico **MARTINEZ–MACIAS, Texas Department of Corrections Death Row Inmate No. 771**

v.

James A. **COLLINS, Director, Texas Department of Criminal Justice, Institutional Division.**

**Nos. EP–88–CA–473–B, 88–0961R–01.**

United States District Court, W.D. Texas, El Paso Division.

Nov. 6, 1991.

Douglas G. Robinson, Skadden, Arps, Slate, Meagher & Flom, Washington, DC, Randall T.E. Coyne, Norman, OK, for petitioner.

Robert S. Walt, Asst. Atty. Gen., Austin, TX, for respondent.

## ORDER

BUNTON, Chief Judge.

BEFORE THIS COURT is Petitioner's Application for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in the above-captioned cause. Petitioner timely filed written objections. Respondent timely filed written objections and Petitioner Responded. After consideration of the Petition and Report and Recommendation of Magistrate Judge Janet Ruesch, this Court is of the opinion the Magistrate Judge's Report and Recommendation should be ADOPTED and the Petition for Writ of Habeas Corpus should be GRANTED.

The Magistrate Judge limited her constitutional error examination to the ineffective assistance of counsel at the guilt and sentencing phases of Petitioner's trial. Pursuant to *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Magistrate Judge concluded Petitioner's trial counsel's performance fell outside the wide range of reasonable professional conduct, and Petitioner was prejudiced by counsel's shortcomings. There is a reasonable probability Petitioner would have received a life sentence in prison in lieu of the death sentence he received for the murders of Robert and Naomi Haney which occurred on December 7, 1983.

The Report and Recommendation and the parties' briefing is extensive. Magistrate Judge Ruesch painstakingly addressed the facts and extensively applied the law, thus this Court deems unnecessary an extensive rehash. Consequently, this Court will summarily address the parties' objections in order to supplement the record.

## A. RESPONDENT'S OBJECTIONS

### 1. Presumption of Correctness

■ Respondent objects to the Magistrate Judge concluding the State court failed to conduct a full and fair evidentiary hearing as required by *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). "[A] federal evidentiary hearing is required unless the [S]tate-court trier of fact has after a full hearing reliably found the relevant facts." *Id.* at 312–13, 83 S.Ct. at 757. The Magistrate Judge correctly concluded the presumption of correctness under 28 U.S.C. § 2254(d) was not applicable.

Respondent contends Petitioner failed to offer sufficient reasons justifying the evidentiary hearing conducted by the Magistrate Judge. "In capital proceedings generally, the[e Supreme] Court has demanded that factfinding procedures aspire to a heightened standard of reliability." *Ford v. Wainwright,* 477 U.S. 399, 411, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986).

Section 2254(d) provides the presumption does not apply in eight circumstances. At least four apply here as Petitioner contends, 28 U.S.C. § 2254(d)(2), (3), (6), (8). Generally,

> No "full and fair" evidentiary hearing has occurred if "the material facts were not adequately developed at the [S]tate court hearing." ... Material facts are those facts crucial to a fair, rounded consideration of a petitioner's claim.... Material facts have not been "adequately developed" where the petitioner alleges undeveloped evidence sufficient to call into question the "reliability" of the [S]tate court's determination of [P]etitioner's federal claims.

*Streetman v. Lynaugh,* 812 F.2d 950, 958 (5th Cir.1987) (quoting *Townsend* ) (citations omitted).

The State court failed to adequately develop the material facts necessary at either the guilt or sentencing phase of Petition-

er's trial. As a result of the deficiencies, the Magistrate Judge correctly decided a hearing was required to permit the full development of material facts necessary for Petitioner's federal claims. Both sides were given a full and fair opportunity to develop the facts. As a result of the hearing, an expansive record was developed which provided a firm basis for the Magistrate Judge's decision.

### 2. Counsel's Strategy Regarding Alibi

■ Respondent objects to the Magistrate Judge concluding a disinterested witness was available at the time of trial, Mario Carreon, who could have provided Petitioner an alibi for the day the crimes in question were committed. At trial, the only evidence placing Petitioner at the scene of the crime was Pedro Luevanos, the alleged accomplice who testified pursuant to a plea agreement. Petitioner was charged with the assault on and robbery of Frank Kolenberg in California in September 1982. The State did not introduce evidence of the Kolenberg offense. However, Petitioner's counsel feared any alibi testimony would open the door to the Kolenberg offenses, an extraneous offense for which Petitioner had not been convicted.

Respondent contends Petitioner's counsel acted reasonably by not taking the risk of opening the door to presentation of the extraneous Kolenberg incident. However, the Magistrate Judge found Petitioner's counsel never researched whether the Kolenberg crime was sufficiently similar to the murder in question to be introduced. As the Magistrate Judge reasons, counsel's research of Texas law would have proved incorrect his assumption regarding the admissibility of the Kolenberg offenses. Therefore, the Magistrate Judge concluded trial counsel's failure to use Mr. Carreon as an alibi witness was not a reasonable strategic decision, and the failure constituted deficient performance.

■ Texas law exists on which Defense counsel could have relied for the proposition the Kolenberg crime was not admissible at the guilt phase. In order for the extraneous offense to be admissible for the purpose of proving identity, the extraneous offense must be so similar to the one at issue so as to be the "signature" of the Petitioner's modus operandi. As the Magistrate Judge delineated, the differences between the Kolenberg crimes and the crimes at bar far outweigh the similarities, thus precluding the Kolenberg crimes from being introduced to prove identity. As Petitioner contends, identity was put into issue by the trial counsel. The use of Mr. Carreon as an alibi witness would not have increased the risk.

Respondent further claims the danger of opening the door to the extraneous Kolenberg offenses existed as trial counsel could not account for Petitioner's whereabouts on December 6, 1983, the possible date of the crimes of which Petitioner was convicted. Counsel's investigation tended to place Petitioner in the company of Mr. Luevanos, and counsel was unable to sufficiently confirm the possibility of an unnamed second person having committed the crime. However, Petitioner correctly points to Respondent's attempt to make the introduction of the alibi contingent on the defense being able to provide unnecessary information. By the time Mr. Carreon could have been called as a witness, the State held the position the crime occurred on December 7, 1983. Furthermore, Petitioner's sole defense at trial was he did not commit the crime. Mr. Carreon's alibi testimony was powerful evidence in support of Petitioner's defense. Under these circumstances, counsel's failure to call Mr. Carreon fell outside the range of professionally competent assistance as concluded by the Magistrate Judge. Counsel's failure to put on an alibi defense prejudiced Petitioner and undermined the confidence of the outcome.

### 3. Rebuttal of Jennifer Flores

■ Respondent objects to the Magistrate Judge's finding that Petitioner's trial counsel acted unreasonably in failing to present testimony from either defense investigator Cecil Ming or Petitioner's daughters to rebut Jennifer Flores' testimony. Jennifer and her mother, Lucy Flores, were surprise witnesses announced

by the State whose testimony the Magistrate Judge called "devastating." Jennifer testified at trial she saw Petitioner in the bathroom of his trailer one afternoon with blood on his hands and shirt. The afternoon in question was prior to Jennifer staying at Petitioner's house with his daughters. Lucy testified about the specific date Jennifer saw Petitioner and the questionability of Jennifer's memory.

Trial counsel never interviewed Petitioner's daughters who could have provided valuable testimony to refute the testimony of Jennifer. Mr. Ming could have provided valuable evidence casting further doubt on the testimony of Jennifer and Lucy Flores as the Magistrate Judge concluded. Ignoring the witnesses to refute the devastating trial testimony provided no strategic advantages. The Magistrate Judge correctly concluded counsel's failure to talk to Petitioner's daughters and to use either the children or Mr. Ming to respond to this testimony constituted ineffective assistance of counsel. Further, counsel's failure to refute the devastating testimony prejudiced Petitioner and undermined the confidence of the outcome.

### 4. Counsel's Actions Regarding Punishment

■ The Magistrate Judge concluded Petitioner's counsel should have investigated and presented evidence from family members regarding Petitioner's good character traits. Respondent objects and claims the additional testimony would have been duplicative. However, Petitioner's counsel failed to interview the family members in order to make a proper determination. Additionally, counsel's failure to prepare Janet Macias, Petitioner's wife, for testimony at the sentencing stage of the trial added to the Magistrate Judge's finding of ineffective assistance of counsel.

The Magistrate Judge further determined Petitioner's counsel should have investigated and presented evidence from expert testimony regarding Petitioner's deprived social background, and Petitioner's counsel failed to utilize records from the California Rehabilitation Center (CRC) to demonstrate Petitioner's good behavior and attempts to rehabilitate while in custody. Respondent objects and argues the failure by trial counsel to investigate or present such evidence was a reasonable tactical decision based on counsel's belief that any evidence about Petitioner's drug use would not be considered mitigating evidence. Petitioner correctly reasons, however, Respondent's argument rests on the assumption that any possible negative reaction of a jury to evidence of drug abuse or a violent childhood excuses counsels failure to investigate. The CRC's records were readily available to trial counsel, but the evidence was never admitted to the jury because counsel never discovered it. At the habeas hearing, Dr. Cecil Whiting, an education psychologist, presented a striking picture of a child who grew up facing serious disadvantages and adversities, yet became a loving son, husband, and father.

The picture the jury received at the sentencing hearing was very negative and truncated as compared to the habeas hearing, which established a more complete picture of Petitioner. The State's case would naturally seem extremely strong at the punishment phase without Petitioner's counsel introducing any available mitigating evidence. Contrary to Respondent's contentions, Dr. Whiting's testimony was not of minimal value because of the lack of any causal link between the crime and Petitioner's background. The Magistrate Judge correctly concluded Petitioner received ineffective assistance of counsel at the sentencing phase of his trial. Furthermore, Petitioner was prejudiced by his trial counsel's representation at the sentencing phase.

### B. PETITIONER'S OBJECTIONS

■ Petitioner make three brief objections, which this Court will briefly address. First, the Magistrate Judge correctly concluded the trial counsel's failure to request a continuance when the State announced it would call Jennifer Flores as a witness was not ineffective assistance. Although counsel learned at a late date Jennifer would testify, her being called was not an unexpected occurrence and the substance of her

testimony was not surprising. Counsel's failure to request a continuance did not constitute deficient performance.

■ Second, the Magistrate Judge correctly concluded counsel's failure to put Dr. Walker, a child psychologist, on the stand to testify about the credibility of children's eyewitness testimony did not constitute ineffective assistance. As the Magistrate Judge correctly explains, Dr. Walker's testimony would have been used to impeach the testimony of a witness because such testimony was inadmissible in this case.

Third, Petitioner objects to the Magistrate Judge's finding it highly unlikely any El Paso court in 1984 would have authorized the payment of $11,599 the federal government paid Dr. Whiting for his testimony at the habeas hearing. Petitioner concedes Texas law provided for payment of only $500 for investigators and experts. The Magistrate Judge reached the reasonable and correct conclusion.

IT IS ORDERED the Report and Recommendation of Magistrate Judge Janet Ruesch, filed April 26, 1991, in the above-captioned cause is hereby APPROVED AND ADOPTED.

## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

RUESCH, United States Magistrate Judge.

Petitioner seeks habeas corpus relief pursuant to 28 U.S.C. § 2254. On June 24, 1984, in the 168th District Court of El Paso County, Texas, Petitioner was convicted of capital murder. R. XV 1138–1139; R. I 99.[1] He was given a death sentence based on the jury's answers to two special issues. R. XVI 226–228; R. I 114 (Judgmt. dated 7/5/84). On direct appeal, the Texas Court of Criminal Appeals affirmed after considering the two points of error raised by appointed appellate counsel. *Macias v. State*, 733 S.W.2d 192 (Tex.Crim.App.1987) (*en banc*); Exh. P–106. On February 22, 1988, the United States Supreme Court denied Petitioner's request for a writ of certiorari after having stayed Petitioner's execution scheduled for February 12, 1988. *Macias v. Texas*, 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988); State Appeal Recs., Order of Justice White dated 2/10/88; State Hab.Recs., Order of Judge Koehler dated 9/9/88.

At the request of the American Bar Association's Postconviction Death Penalty Representation Project, Petitioner's present attorney, Douglas G. Robinson, agreed to represent Petitioner on a *pro bono* basis on March 3, 1988. State Hab.Recs., Emergency Application for Stay of Execution recv'd in Texas Court of Criminal Appeals 5/5/88, p. 4. Mr. Robinson filed Petitioner's first and only state application for habeas relief on September 6, 1988 along with a Motion for Stay of Execution. State Hab.Recs., Pet. for Writ. Approximately one month later, on October 6, 1988, the

---

1. The records of Petitioner's trial are in 18 volumes. One volume is marked "Exhibits." Each of the other 17 volumes is numbered except for the first volume, which contains a three-page index beginning at the third page. This unnumbered volume will be referred to as volume I. These 17 volumes are herein designated "R." and will be cited with that designation, the volume number, and the page number, as follows: "R. I 87." Exhibits admitted at trial will be cited as "State Exh. 3" or "Def. Exh. 3."

The record on direct appeal is in one volume, the first two pages of which are a computer printout. This record is herein designated "State Appeal Recs." and will be cited with that designation and a description of the pertinent document.

The State habeas records are in four volumes, which are not numbered. These four volumes are herein designated "State Hab. Recs." and will be cited with that designation and a description of the pertinent document.

Pleadings filed in this court will be cited by the name of the pleading and the number at the bottom of the first page of the pleading, herein called "Dkt. No. ___."

This court held an evidentiary hearing from September 7 through 15, 1989. The transcript of that hearing is in eight volumes with the seventh volume being the sealed testimony of Gary Weiser, Petitioner's trial attorney. The first six volumes and the eighth volume are herein designated "Tr." and the seventh volume is designated "Sealed Tr." These eight volumes will be cited with their designations, the volume number, and the page number, as follows: "Tr. IV 960." Exhibits admitted at the habeas hearing will be cited as "Exh. P–3" for Petitioner's exhibits and "Exh. R–3" for Respondent's exhibits.

trial court denied Petitioner's request for an evidentiary hearing and entered an order, prepared by an assistant district attorney, denying habeas relief. State Hab. Recs., pp. 38 (Let. from Asst. D.A. Dinsmoor to Judge Koehler), 39–48 (proposed Trial Court Findings), 49–50 (Judge Koehler's Orders of 10/6/88), 51–60 (Judge Koehler's Trial Court Findings). The Texas Court of Criminal Appeals affirmed this decision on October 25, 1988. State Hab. Recs., Action Taken.

Petitioner filed this federal petition for habeas relief on November 10, 1988 along with another application for a stay of execution. Pet., Dkt. No. 1; Emergency Application for Stay of Execution, Dkt. No. 6. Petitioner's execution has been stayed since November 16, 1988 when District Judge Garza granted that relief and ordered the case referred to a Magistrate Judge for an evidentiary hearing and a report and recommendation. Order, Dkt. No. 9.

After filing the records of the state court proceedings, Respondent requested that the Magistrate Judge deny Petitioner an evidentiary hearing because the factual findings of the state habeas court were entitled to a presumption of correctness under 28 U.S.C. § 2254(d).[2] Resp's Mot. to Modify Court's 11/16/88 Order, Dkt. No. 13. Petitioner responded that he was not requesting an evidentiary hearing regarding those claims involving only legal issues. Memo. of Law in Support of Pet's Mot. for Evidentiary Hearing, Dkt. No. 31, p. 12. However, he argued that he should be afforded an evidentiary hearing concerning claims involving factual disputes because the state habeas court had not conducted "a full and fair evidentiary hearing" as required by *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963); thus, that court's fact findings were not entitled to a presumption of correctness under § 2254(d). *Id.*, at 7–12, 20, 28, 35, 38, 44, 45, 51. This court agreed with Petitioner and ordered that an evidentiary hearing be held concerning the claims proposed by Petitioner. Orders on Pretrial Mots., Dkt. No. 37. The habeas hearing was held in September 1989. Scheduling Order, Dkt. No. 45; Tr. I 1.

Petitioner asserts that numerous constitutional errors occurred in his capital murder trial. Pet., Dkt. No. 1; First Amended Pet., Dkt. No. 27; Pet's Post–Hearing Memo., Dkt. No. 74. Only one will be addressed here: ineffective assistance of counsel at the guilt/innocence and sentencing phases of trial.

On January 5, 1984, Petitioner was indicted for capital murder, specifically, for causing the death of Robert Haney during the course of a robbery on December 7, 1983.[3] R. I 3–5. On January 10, 1984, Gary Weiser was appointed to represent Petitioner. Tr. IV 957–958; Exh. P–67. Mr. Weiser had been an assistant district attorney from 1972 to 1982 during which time he became first assistant and tried seven or eight capital murder cases. Tr. IV 953, 954. In 1982, he joined the Scott, Hulse law firm and in January 1984, the month in which he was appointed to represent Petitioner, he became a partner in that firm. *Id.*, at 953, 956. Upon Mr. Weiser's request for co-counsel, the court appointed, serially, two members of the Scott, Hulse law firm: first, Joseph Hood, whose work ended in March 1984,[4] and second, John Calhoun, who had also been an assistant district attorney, leaving that office in late

---

**2.** In a conversation with District Judge Garza on December 8, 1988, he authorized the undersigned Magistrate Judge to revise, if warranted, his November 16 Order granting an evidentiary hearing.

**3.** Petitioner was indicted in two counts: murdering Robert Haney while committing a robbery and murdering Robert Haney while committing a burglary. R. I 3–4. Although Petitioner's attorneys tried to force the prosecution to select one count before trial (R. I 35–36), the court denied that request (R. III 104). At the

close of the evidence and before the jury was charged, the prosecution elected to proceed on the robbery count. R. XV 991. Thus, the jury found Petitioner guilty of murdering Robert Haney in the course of committing a robbery. R. XV 1138.

**4.** Mr. Hood did one thing after March 1984. He spent one and one-half hours doing legal research regarding jailhouse confessions on June 14, 1984. Exh. P–67.

1983. Tr. IV 960, 962–963; Exh. P–67; R. I 17–18, 19, 28–29; R. II 28. Mr. Calhoun began working on the case on May 4, 1984, one month before jury selection began. Exh. P–67. He helped select the jury, helped try the case, and appeared for the last time at Petitioner's sentencing on July 5, 1984. *Id.* These three attorneys spent a total of 540.50 hours on this case and were paid a total of $6,400 in attorneys' fees, resulting in an hourly rate of $11.84. Exh. P–67. The errors that occurred in this case are inherent in a system which paid attorneys such a meager amount.[5]

The statute in effect at that time allowed payment for only in-court time; appointed attorneys received no compensation for the crucial, and often case-determinative, time spent preparing a case for trial. Tex.Code Crim.Proc.Ann. art. 26.05 § 1(a) & (b) (Vernon 1989) (amended 1987; *see* Historical Note for 1981 version). For each day in court in a capital case, the statute required that an attorney be paid "a reasonable fee to be set by the court but in no event to be less than $250." *Id.*, at 1(b). In this case, for four in-court days, the attorneys were paid $250 per day and for the other eighteen in-court days, Mr. Weiser and Mr. Calhoun were paid $300 per day, which, at the high end, resulted in a per attorney fee of $150 a day. Exh. P–67. In 1984, investigators fared no better. For both investigative services and expert testimony, the statute provided for "a reasonable fee to be set by the court but in no event to exceed $500." Tex.Code Crim.Proc.Ann. art. 26.05 § 1(d) (Vernon 1989) (amended 1987; *see* Historical Note for 1981 version). In this case, defense investigator Cecil Ming spent more than $500 worth of time before trial; and he spent more time than that stated in his report. Tr. IV 1036–1037; Exh. P–67A; Exh. P–67B;[6] Exh. P–85; Exh. P–139. Although the trial judge stated that, after the first $500 was expended, he would consider

an additional sum for investigation (R. I 16), Mr. Weiser recalled that he requested more money but was refused it (Tr. IV 1037). It appears that Mr. Ming was paid only $500. Exh. P–67B.

Although Mr. Weiser had co-counsel, he testified that he took primary responsibility for the defense and made all significant decisions. Tr. IV 963. Thus, the discussion herein will focus on what Mr. Weiser did or did not do. Despite this focus, the purpose of the inquiry "is not to grade [Mr. Weiser's] performance" but to determine whether Petitioner was accorded due process. *Strickland v. Washington*, 466 U.S. 668, 695, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984); *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir.1990). Nonetheless, it is clear that some of the comments herein will be construed as criticisms of Mr. Weiser's performance. Though that construction may seem unavoidable, this court knows that Mr. Weiser is, and in 1984 was, one of the best attorneys in El Paso. Thus, the trite-but-true lesson is that "it can happen to the best of us."

## I. THE LEGAL STANDARD

An ineffective assistance of counsel claim is governed by the two-pronged test set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail, a petitioner must show both that his attorney's performance was deficient and that the attorney's error prejudiced petitioner's case. *Id.* at 686, 104 S.Ct. at 2064. The major question under the performance prong is "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. at 2065. The circumstances to be considered are those existing at the time of counsel's performance without interference from "the distorting effects of hindsight." *Id.* at 688,

---

5. This finding is justified despite Mr. Weiser's testimony that the inadequacy of his fee did not affect his representation of Petitioner. Tr. IV 1037.

6. Exhibit P–67B is a typewritten version of investigator Ming's Report which is Exh. P–67A. After the habeas hearing, the attorneys agreed

to provide more legible copies of certain exhibits. Pursuant to that agreement, Exhibit P–67B was submitted as a typewritten version of Exh. P–67A. For other exhibits that were amplified with a typewritten version or replaced with a more legible copy, see Order, Dkt. No. 86, and attached Court Exhibits 3, 4, 5.

690, 104 S.Ct. at 2065, 2066. And, the court is required to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065.

 The question under the prejudice prong is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A verdict that has weak support is more likely to be affected by attorney error than one with strong support. *Id.* at 695, 104 S.Ct. at 2069. Thus, the evidence introduced at Petitioner's trial will be discussed below. When considering the prejudice prong, a court must assume that the decisionmaker is impartially applying the law, rather than consider any "idiosyncracies of the particular decisionmaker." *Id.* at 695, 104 S.Ct. at 2068. But, where evidence of the decisionmaking process is part of the record, it can be considered. *Id.* In this case, the jury's difficulty in reaching a verdict, which is part of the record, will be discussed.

Finally, the relevant question is whether the adversary system worked in this case. *Strickland,* at 690, 695, 698, 104 S.Ct. at 2066, 2069, 2070. If, as here, it did not, confidence in the outcome is undermined. *Id.* at 695, 698, 104 S.Ct. at 2069, 2070.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT/INNOCENCE PHASE

### A. *Evidence of Petitioner's Guilt*

Unlike the typical death penalty case, Petitioner's guilt is in doubt. *Russell v. Lynaugh,* 892 F.2d 1205, 1206 (5th Cir. 1989). The trial evidence disclosed that Robert and Naomi Haney were murdered in their house in El Paso, Texas on December 7, 1983 sometime near noon. R. XII 114, 171–172, 198–199, 234–236, 237, 238; R. XIV 855, 857, 862–864, 872–873, 875–877. The Haneys were found the next day, on the evening of December 8, 1983. R.

XII 234–235, 237, 238. Each was fully dressed, lying on the living room floor face down in a pool of blood, and each was tied similarly, with feet bound together and hands tied behind their backs. R. XII 237, 238; R. XIII 473, 482, 483, 484; R. XIV 794–796, 881–882. Robert Haney died from chop wounds to his head which had been inflicted by a sharp instrument such as an axe or large knife. R. XIII 480; R. XIV 875. Blood was splattered on the floor, walls, and ceiling of the living room. R. XIII 484; R. XIV 657–658, 794–796, 834, 884. On the floor to the left of Robert Haney's head was potting soil from an overturned pot. R. XIII 483–484; R. XIV 917, 918. In the soil was a tire tread shoe print from a working or hiking boot, with the front of the shoe facing Mr. Haney's head. R. XIII 484, 485, 489, 490, 491–492, 500, 501, 508. Police concluded that this is where the assailant stood while striking Mr. Haney with the murder weapon. R. XIV 886–887, 918–919, 925–926. Items taken from the Haneys' house included three or four pistols, coins, a man's watch, a wallet, a green athletic bag, and a machete. R. XII 126, 129–130, 130–131, 134, 142–146, 148, 195–196; R. XIII 458–459, 460, 461.

Maria Monteros, a neighbor of the Haneys, testified that on December 7, 1983, beginning at approximately 10:00 a.m., a car with two men in it made the same repeated trip around her neighborhood, which included driving down an alley behind the Haneys' house. R. XIII 416–423. During one trip through the alley at about 11:15 a.m., the driver stopped the car, got out, and asked Maria's husband, Gilbert, if he could urinate in the alley. *Id.,* at 398, 400. When Mr. Monteros said "no," the driver got in the car and drove off. *Id.,* at 398, 400, 410. Both Maria and Gilbert Monteros identified Pedro Luevanos as the driver; but neither identified Petitioner as the passenger, although Petitioner was in a line-up viewed by both Mr. and Mrs. Monteros. *Id.,* at 401–402, 408, 411–412, 424, 425, 433–434; R. XIV 930–931. Mr. Monteros saw the passenger's face at an angle but noted that the passenger was not wearing glasses. R. XIII 412. Mrs. Monteros

agreed that the passenger was not wearing glasses. *Id.*, at 446.

The only evidence connecting Petitioner to the crime was (1) the testimony of Pedro Luevanos, who told different stories but ultimately confessed to being a participant, (2) the testimony of Edward Parker, a jail inmate who claimed to have overheard Petitioner confess to the crime, (3) the testimony of nine-year-old Jennifer Flores, who told different stories, with the best for the prosecution being the one she told at trial, and (4) three items of circumstantial evidence.

Pedro Luevanos was arrested at the Baltimore Spice Company, where he worked, on the night of December 9, 1983, after Maria Monteros gave police the license number of the car that had been driving around her neighborhood on December 7, 1983. R. XIII 360–361; R. XIV 890–891, 894–899, 900–901. That night, Luevanos gave his first version of the events of December 7, 1983. State Exh. 13;[7] R. XII 150; R. XIV 901–902. On the morning of December 7, Luevanos borrowed his father's car to cash his paycheck at a convenience store in Canutillo, Texas. State Exh. 13. He met Petitioner at the store and the two began driving around town in Luevanos' father's car drinking beer. *Id.* In one area of town, Petitioner got out of the car, told Luevanos to wait, and walked into an alley. *Id.* Luevanos drove around the block and on his third trip, he saw Petitioner standing at the corner of the alley and the street. *Id.* Petitioner was carrying an athletic bag which he threw into the trunk of the car. *Id.* Petitioner had blood on his shirt, face, and glasses. *Id.* Petitioner admitted that he had killed some people because they recognized him. *Id.* On the basis of this statement, Luevanos was given transactional immunity in exchange for his testimony before the grand jury and at Petitioner's trial. State Exh. 14;[8] R. XII 151.

On January 5, 1984, Luevanos testified similarly before the grand jury. State Exh. 15; R. XII 152. He reiterated that he drove around the block after Petitioner got out of the car (State Exh. 15, pp. 39–46, 61), that Petitioner returned to the car with an athletic bag he threw into the trunk and with spots of blood all over him (*Id.*, at 47–49, 50–52), and that Petitioner said he killed people because they recognized him (*Id.*, at 53). According to Luevanos' later statement and testimony, this version is not true.

The second version was disclosed after Jose Holguin, a jail inmate, told police about statements Luevanos had made to Holguin while they were in jail together. Exh. P–50 & Exh. P–51;[9] R. XIV 908, 910. According to Holguin, Luevanos said that he and Petitioner planned the crime and selected the Haneys because Petitioner had worked for them and knew they had money. Exh. P–50 & Exh. P–51. Luevanos entered the house first and beat up Robert Haney, who answered the door. *Id.* While Luevanos was beating up Mr. Haney, Petitioner entered the house wearing a ski mask. *Id.* After Luevanos and Petitioner tied up the Haneys, Luevanos went through the house looking for things to take. *Id.* Luevanos took a wallet, coins, guns, jewelry, and pulled a diamond ring from Mrs. Haney's hand. *Id.* Petitioner found $8,000 in cash. *Id.* When they were ready to leave, Petitioner said that they would have to kill the Haneys because they recognized him. *Id.* Petitioner got a machete from another room and cut Robert Haney's throat with it. *Id.* Petitioner told Luevanos that he, Luevanos, would have to kill Naomi Haney, but Luevanos did not admit that he had killed her. *Id.* After both victims were killed, Luevanos and Petitioner left the house and put the stolen

---

7. Luevanos' December 9, 1983 written statement is also in the record as State Exh. 1 in the Pretrial Motions hearing. R. XI 106.

8. Luevanos' first plea agreement is also in the record as State Exh. 2 in the Pretrial Motions hearing. R. XI 55–56.

9. Exhibit P–51 is a typewritten transcript of Exhibit P–50, the Holguin affidavit.

items in the trunk of Luevanos' car. *Id.* Luevanos kept the $8,000 in his house and buried the other items.[10] *Id.*

With this information, the District Attorney revoked the grant of transactional immunity and obtained Luevanos' agreement to, again, testify truthfully, and plead guilty to a burglary-of-a-habitation charge on which the District Attorney would recommend a sentence of 25 years in prison.[11] State Exh. 16;[12] R. XII 156–157. On January 20, 1984, Luevanos gave his second written statement to the police and, although this statement differed from what he allegedly told inmate Holguin, Luevanos now admitted being in the Haneys' house. State Exh. 2;[13] R. XII 121–122, 124.

In his January 20, 1984 statement, Luevanos said that he knocked on the front door and pushed Robert Haney into the house when he answered the door. State Exh. 2. In this version, Petitioner entered the house with a paper grocery bag over his head into which he had cut two eyeholes.[14] *Id.* Luevanos tied up the man and Petitioner tied up the woman. *Id.* Petitioner told Luevanos to watch the Haneys while Petitioner went into the other rooms. *Id.* He came back with four pistols, coins, and a sporting bag. *Id.* Petitioner took a man's brown wallet from a table in the dining room and gave it to Luevanos. *Id.* Luevanos took a watch with turquoise stones. *Id.* In this version, there is no mention of jewelry; Luevanos denies knowledge of Mrs. Haney's diamond ring

and denies the existence of $8,000 cash. *Id.* In this version, Luevanos did not stay in the house until Robert and Naomi Haney were killed. *Id.* Luevanos said that Petitioner went into another room and came out with a long knife. *Id.* Petitioner said he would have to kill them because they recognized him. *Id.* While Luevanos was in the dining room, Petitioner swung the knife down on Robert Haney and Luevanos heard a thump. *Id.* After Luevanos heard a second thump and heard Mrs. Haney say "Oooh," Luevanos left the house through a back door and walked fast to his car. *Id.* After waiting for one minute, Petitioner came to the car carrying the sporting bag. *Id.* When they got back to the convenience store in Canutillo, Texas, Luevanos took three of the guns and Petitioner put one gun that was in a case down the front of his pants. *Id.*

Luevanos' trial testimony was similar to his written statement of January 20, 1984, with a few changes. In his statement, he said that, after going into a big store, Petitioner returned with two bags, a large one with nothing in it and a small one containing a quart of Budweiser beer. State Exh. 2. At trial, Luevanos said Petitioner had only one medium-sized brown bag in which he carried the quart of beer. R. XII 107–108. In his statement, Luevanos said that on the day of the crime he was wearing work boots with flat soles and Petitioner was wearing work boots with tractor soles.

---

**10.** At trial, Luevanos said that he lied to Holguin when he said that he and Petitioner planned the crime, Petitioner wore a ski mask, Luevanos took Mrs. Haney's diamond ring, and Luevanos got $8,000 cash. R. XII 218–220.

**11.** Also as a result of the information obtained from Holguin, Luevanos took a polygraph examination on January 18, 1984. Exh. P–52; Exh. P–54. The focus of the polygraph was twofold: whether Luevanos was directly involved in the murder of either Robert or Naomi Haney and whether Luevanos knew the location of the items taken from the Haneys' house. Exh. P–52. Luevanos denied both inquiries. *Id.* When confronted with the suggestion that he lied when he denied having assaulted Naomi Haney and causing her death, Luevanos said, "I never even saw them sir." *Id.* As discussed in the text, *infra*, Luevanos admitted in his second written statement and in his trial testimony that

he was in the Haneys' house when they were murdered. Luevanos' claim that he knew nothing about the location of the items stolen from the Haneys' household, which the polygraph examiner concluded was a lie (*Id.*), was short-lived. Two days after the examination, Luevanos directed the police to the place where he had buried the stolen items. Exh. P–54.

**12.** Luevanos' second plea agreement is also in the record as State Exh. 3 in the Pretrial Motions hearing. R. XI 58, 64.

**13.** Luevanos' January 20, 1984 written statement is also in the record as State Exh. 4 in the Pretrial Motions hearing. R. XI 58.

**14.** Luevanos told the grand jury that Petitioner never picked up a paper bag. State Exh. 15, last page.

State Exh. 2. At trial, Luevanos could not remember the kind of shoes he had worn on December 7, 1983, but he remembered that Petitioner wore work boots with tractor soles. R. XII 131–132. At trial, Luevanos also testified that Petitioner stood on Robert Haney's left side when he swung the knife down on him. *Id.*, at 128. Luevanos' written statement made no mention of the side of Mr. Haney on which Petitioner stood. State Exh. 2. Standing on Mr. Haney's left and wearing tractor soles indicated that Petitioner was the donor of the footprint in the soil next to Mr. Haney. R. XIII 483–484, 485, 489, 490, 491–492, 500, 501, 508. In his written statement, Luevanos said that he and Petitioner took four guns from the Haneys' household. State Exh. 2. At trial, Luevanos was not sure whether they took three or four guns. R. XII 134, 193, 194. In his statement, Luevanos said that when they got back to the convenience store, Petitioner put a gun down the front of his pants. State Exh. 2. At trial, he said he was not sure whether Petitioner took a gun or something else. R. XII 135–136, 194, 203–204. Finally, contrary to Mr. and Mrs. Monteros' description of the passenger, Luevanos testified that Petitioner was wearing glasses at the time of the offense. R. XII 132, 175–176.

At trial, Luevanos identified a machete as the murder weapon. R. XII 125–126; State Exh. 3 & State Exh. 4 (the machete and scabbard). His testimony about the machete was inconsistent. He said that Petitioner cleaned it but Luevanos did not know when or with what. R. XII 138, 209, 210. He said that the machete was clean when he saw it after the crime; he also said it was not clean when he saw it after the crime, although it had less blood on it

than previously. *Id.*, at 138, 208. He said that the machete had not been in the athletic bag, although it was possible that it had been in the athletic bag. *Id.*, at 138–139, 175, 202.

The second piece of evidence connecting Petitioner to the murder of Robert Haney was the testimony of jail inmate Edward Parker.[15] Mr. Parker testified that he was in the bakery section of the jail with Petitioner in late January 1984 when he overheard a conversation between Petitioner and another inmate named Clark. R. XIV 739–740, 742, 749. The first thing Parker heard Petitioner say was that he had tied up an old man and assassinated him. *Id.*, at 741, 761–762. Petitioner also said that he had worked for this man and had been to his house and that Petitioner had worn a blue shirt with blood stains on it. *Id.*, at 741.

The third piece of evidence connecting Petitioner to the murder of Robert Haney was the testimony of nine-year-old Jennifer Flores and her mother.[16] Jennifer testified that one night a couple of weeks before Christmas, she spent the night at Petitioner's trailer with his daughters. R. XIII 324, 352; *see also*, R. XIII 336, 346–347, 350, 357. When Petitioner got home after 3:00 p.m., Jennifer saw spots of blood on his shirt. *Id.*, at 325, 326, 341, 345–346. Petitioner was carrying a gun that looked like a BB gun but was not a BB gun. *Id.*, at 328. Jennifer saw Petitioner walk off into the desert carrying the shirt over his shoulder and the gun. *Id.*, at 331, 341–342, 346. Jennifer's mother, Lucy Flores, testified that the night Jennifer stayed at Petitioner's trailer was Wednesday, December 7, 1983, although she had previously said

---

**15.** The jailhouse confession was the subject of much debate. Petitioner's attorneys filed a Motion to Suppress any statements made by Petitioner while incarcerated (R. I 57–58) and the prosecution agreed that a hearing on the Motion was necessary (R. II 8). The hearing was held on June 14, 1984, after the jury was selected, and it focused on the question of whether Claude Clark, a known jailhouse snitch, was acting as an agent for the State when Petitioner made the statements. R. XI 98–106. At the hearing, it became evident that another inmate, Edward Parker, overheard the conversation be-

tween Petitioner and Clark. *Id.* Mr. Weiser requested a hearing outside the presence of the jury concerning the admissibility of Parker's testimony. *Id.*, at 105–106. This hearing was held during the trial, before the State put Parker on the stand in front of the jury. R. XII 681–718, 737–764. The State never called Clark to testify at Petitioner's trial.

**16.** This testimony was the subject of a number of defense motions discussed in Part II. C., *infra.*

that the night in question was Tuesday, December 6, 1983. R. XIII 379–383.

The circumstantial evidence which implicated Petitioner, and which was argued by the prosecution as implicating Petitioner, consisted of evidence of the footprint next to Robert Haney's head, Petitioner's trip to California shortly after Robert Haney's murder, and Petitioner's work history with the Haneys. R. XV 1024, 1042, 1049, 1105–1106 (the footprint); R. XV 1024, 1035, 1036, 1051 (trip to California); R. XV 1029, 1030, 1032, 1044, 1104 (work history). As stated above, the police found a tire tread shoe print in the dirt next to Robert Haney's head. R. XIII 483–484, 485, 489, 490, 491–492, 500, 501, 508. Luevanos hooked Petitioner to this shoe print by testifying that on the day of the offense Petitioner was wearing work boots with tractor soles. R. XII 131–132. A police officer testified that two officers with similar soles on their shoes entered the Haney house on the night of December 8, 1983, when the bodies were found, but neither of these officers went near the bodies. R. XIV 765–767, 802–803. Thus, the prosecution argued that Petitioner was the donor of the tire tread shoe print. R. XV 1024, 1042, 1049, 1105–1106. There was testimony that, by December 8, 1983, Petitioner had left for California. R. XIII 361, 391, 394, 395. Petitioner was arrested in California on Monday, December 19, 1983 after two El Paso Police Officers followed Petitioner's daughter, on December 16, 1983, on a flight from El Paso to Los Angeles. R. XIV 904–906. On December 20, 1983, Petitioner waived extradition and was brought back to El Paso. *Id.*, at 907, 908. The prosecution argued that these facts constitute flight from the scene of the crime and show that Petitioner is guilty.[17] R. XV 1024, 1035, 1036, 1051. Finally, there was testimony that Petitioner had worked for the Haneys

as a yard man or handy man. R. XIII 462–464; R. XIV 893; Def. Exh. 13. Ernie Delgado, a friend of the Haneys, testified that he was introduced to Petitioner by the Haneys inside the Haneys' house. R. XIII 462–463. One police officer testified that the perpetrator of the crime had been in the Haneys' house before December 7, 1983. R. XIV 832–833. Another testified that the Haneys' handy man became a suspect after he was mentioned by several neighbors during police interviews on December 8 and 9, 1983. *Id.*, at 893.

However, there was no physical evidence linking Petitioner to the crime. No shoes with tractor soles were recovered. R. XIII 490–491, 505; R. XIV 664–665. No bloody clothes or stolen items were taken from Petitioner. R. XIV 936; *see also,* R. XIII 501–502; R. XIV 900–901. Luevanos testified that Petitioner wore glasses during the crime and right after the crime Petitioner's hands and face were sprinkled with blood. R. XII 132, 175–176. Petitioner's glasses were taken from him when he was arrested in California on December 19, 1983. R. XIV 907. No blood stains were found on the glasses. *Id.*, at 664–665, 666–667, 674–675. Fifty to sixty latent fingerprints were taken from the scene and from the items dug up in Luevanos' backyard. R. XIII 474, 493, 534, 589, 601; R. XIV 623, 631–633. None belonged to Petitioner. R. XIII 601–602, 606–607; R. XIV 629, 633–634, 643, 651, 654.[18] Review of all the evidence discloses that Petitioner's guilt is not strongly supported by the evidence.

■ The jury had difficulty reaching a verdict. The jury began its deliberations on Friday, June 22, 1984 at 5:04 p.m. R. XV 1120. Three hours later the jury requested transcripts of the testimony of a number of witnesses including Pedro Lue-

---

17. As stated below, Mario Carreon, the alibi witness, would have testified that Petitioner had long-term plans to go back to California. *See infra,* footnote 20. Carreon's testimony would have confirmed Luevanos' statement that, before December 7, 1983, Petitioner said he wanted to go back to California. R. XII 166–167, 179, 216.

18. *See also,* R. XIII 475, 502, 507, 518; R. XIV 630, 649 (no latent fingerprints on the paper bag with the eye-holes); R. XIII 478, 504, 505 (no latent fingerprints on sunglasses found in the Haneys' front yard); R. XIII 516–517, 532–533; R. XIV 627–628 (no latent fingerprints on the safe in the Haneys' bedroom); R. XIII 610–611 (no latent fingerprints on the wrought iron gate in the back of the Haneys' house).

vanos, Jennifer Flores and her mother, and Edward Parker. R. XV 1120, 1121; R. I 100, 101, 102. The judge told the jury that they had to be more specific concerning the testimony in dispute. R. XV 1121; R. I 100, 102. One hour later the jury attempted to be more specific but was told that its requests were not specific enough. R. XV 1122–1123; R. I 104–105. The jury was retired for the night at 9:10 p.m. R. XV 1126. The next day, Saturday, June 23, in the morning, the jury asked about the legal significance of language in Luevanos' grand jury testimony regarding Petitioner's "past record for violence." [19] R. XV 1126; R. I 108–109. The judge told the jury that it should not consider this language for any purpose. R. XV 1131–1132; R. I 106. The jury then went to lunch from 12:30 p.m. to 1:45 p.m. R. XV 1132–1133. At 5:17 p.m. on Saturday, June 23, the jury notified the court that it could not reach a unanimous verdict. R. XV 1133; R. I 104. When asked about the jury's numerical split, the foreman replied "five and seven." R. XV 1135. Thus, at this point the jury was almost equally divided on the question of Petitioner's guilt. The jury was told to retire for the night and come back the next day, Sunday, June 24, for more deliberations. *Id.* At 3:15 p.m. on June 24, the jury notified the court that it had reached a unanimous verdict. R. XV 1137–1138; R. I 105.

### B. *Failure to Use Available Alibi Testimony*

#### 1. The Alibi

The alibi available at the time of Petitioner's trial was the testimony of Mario Car-

reon, the manager of the Quik 'N Easy convenience store in Canutillo, Texas where Petitioner's wife worked. Tr. IV 1086–1087; Exh. P–85, pp. 1–2. On December 12, 1983, he told police that he last saw Petitioner the day of the Haney murders, when he loaned Petitioner his pickup truck in the morning and took Petitioner to the bus station in the late afternoon. Exh. P–55. One month later, Mr. Carreon elaborated on the events of that day in a statement to defense investigator Cecil Ming. Exh. P–56.

According to Carreon, Petitioner arrived at the Quik 'N Easy at about 8:30 a.m. on December 7, 1983 wearing blue jeans, a blue plaid flannel shirt, no jacket, and "G.I. type" shoes. Exh. P–56. Petitioner did some cleaning in the store until approximately 9:15 a.m. when he asked to borrow Carreon's pickup truck to do some work for a neighbor named Raejeanne. *Id.* Petitioner left in the pickup at about 9:30 a.m. and returned at 11:30 or 11:45 a.m., wearing the same clothes he had worn earlier. *Id.* Upon Petitioner's return, his wife, Janet Macias, was at the store. Several days earlier, Janet had told Carreon that Petitioner was leaving for California because she and Petitioner were having problems.[20] *Id.* From the time Petitioner returned to the store until after 3:00 p.m., Carreon saw Petitioner every 15 minutes while Petitioner and Janet were talking, sometimes inside the store and other times outside the store. *Id.* When Janet asked Carreon to talk Petitioner out of leaving, Carreon said that he would try to do so after he finished work at 3:00 p.m. *Id.* At 3:30 or 3:45 p.m.,

**19.** The language giving the jurors problems should never have been placed before them. The language appears in State Exh. 15, quoted by the jury, as well as State Exh. 14, the first plea agreement with Luevanos. The objectionable language is the following:

> Presently, [Luevanos] is in the same jail as Federico Macias who has already confronted him on one occasion; and once Federico Macias realizes that Pedro Luevanos has been granted immunity to testify against him, Mr. Luevanos' life would be in grave danger. Mr. Macias [sic] past record for violence and the present brutal murder he is charged with indicates a high propensity to commit future acts

of violence. State. Exh. 14; State Exh. 15, 3rd page.

When the jury questioned some of this language, Mr. Weiser stated that he had failed to note the objectionable language, and thus, he had not objected to it. R. XV 1128. At that point, he objected to the language and moved for a mistrial. *Id.*, at 1128–1129. His request for a mistrial was denied. *Id.*, at 1129.

**20.** This statement would have aided the defense by rebutting the prosecutors' argument that Petitioner's trip to California after the Haney murder constituted flight and, thus, was proof of his guilt. R. XV 1024, 1035–1036.

Petitioner and Carreon were outside talking, but Petitioner would not agree to stay. *Id.* At that point, Janet became resigned to his leaving and asked Carreon if she could use his pickup truck to drive home so that she could pack a suitcase for Petitioner. *Id.* And, she asked Carreon to drive Petitioner to the bus station in El Paso. *Id.* Janet left in the pickup. *Id.* When she returned, she had a suitcase for Petitioner. *Id.* Carreon gave Janet a $100 advance on her salary which she had asked for earlier in the day, but Carreon does not know how much of this money Janet gave Petitioner. *Id.* At about 4:30 p.m., Carreon and Petitioner, who was still wearing the same clothes he had worn all day, left the store and drove to the Trailways bus station in El Paso. *Id.*

Mr. Weiser offered a number of reasons for his failure to use this alibi testimony. First, he believed that use of alibi testimony would open the door to an extraneous offense for which Petitioner had not been convicted: an assault on, and robbery of, Mr. Kolenberg in California in September 1982. Tr. IV 1029; Sealed Tr. VII 23–24. Mr. Weiser knew that evidence of this crime would be admitted at the punishment phase and he wanted to keep it out of the guilt/innocence phase. Tr. IV 998–1000, 1029; Sealed Tr. VII 26, 28. In addition, Mr. Weiser found problems with Carreon's story, his credibility, and his criminal record. Tr. IV 1028, 1029; Sealed Tr. VII 19–20, 24, 53, 54, 56, 57. Mr. Weiser could not use Janet Macias to confirm Carreon's testimony because she told three different stories, none of which coincided with Carreon's testimony. Sealed Tr. VII 18, 20–21, 24, 51, 52–53. An examination of each reason discloses that none justified Mr. Weiser's decision (Sealed Tr. VII 20) to forego an alibi defense.

### 2. Opening the Door to the Kolenberg Crime

Mr. Weiser's concern was that any alibi testimony would open the door to the Kolenberg crime. Tr. IV 1029; Sealed Tr. VII

23–24. And, he believed that the defense he used, "Petitioner did not do it," did not open the door to the Kolenberg crime because this defense did not raise the issue of identity. Sealed Tr. VII 23–24. The question is whether Mr. Weiser's assessment of the admissibility of the Kolenberg crime was correct. If correct, his decision to forego an alibi defense cannot constitute attorney error. *Thomas v. Lynaugh,* 812 F.2d 225, 229–230 (5th Cir.), *cert. denied,* 484 U.S. 842, 108 S.Ct. 132, 98 L.Ed.2d 89 (1987). If his assessment was not correct, his decision to forego an alibi defense, to the extent that the decision was based on the Kolenberg crime, would constitute attorney error. *Crockett v. McCotter,* 796 F.2d 787, 792–793 (5th Cir.), *cert. denied,* 479 U.S. 1021, 107 S.Ct. 678, 93 L.Ed.2d 728 (1986); *see also, Murphy v. Puckett,* 893 F.2d 94, 95–96 (5th Cir.1990); *Profitt v. Waldron,* 831 F.2d 1245, 1249 (5th Cir. 1987); *Ricalday v. Procunier,* 736 F.2d 203, 207–208 (5th Cir.1984); *Vela v. Estelle,* 708 F.2d 954, 961–965 (5th Cir.1983), *cert. denied sub nom., McKaskle v. Vela,* 464 U.S. 1053, 104 S.Ct. 736, 79 L.Ed.2d 195 (1984).

The law in Texas at the time of Petitioner's trial [21] allowed the State to use an extraneous offense for a number of purposes including proof of identity, motive, or intent, and refutation of a defensive theory. *Bachhofer v. State,* 633 S.W.2d 869, 871 (Tex.Crim.App. [Panel Op.] 1982); *Albrecht v. State,* 486 S.W.2d 97, 100–101 (Tex.Crim.App.1972). Generally, in order to admit evidence of an extraneous offense, two criteria had to be met: (1) the extraneous offense had to be relevant to a "contested, material issue" and (2) the relevancy of the extraneous offense had to outweigh its prejudicial effect. *Collazo v. State,* 623 S.W.2d 647, 648 (Tex.Crim.App. [Panel Op.] 1981); *see also, Bachhofer v. State,* 633 S.W.2d 869, 871 (Tex.Crim.App. [Panel Op.] 1982); *Murphy v. State,* 587 S.W.2d 718, 722 (Tex.Crim.App. [Panel Op.] 1979); *Ruiz v. State,* 579 S.W.2d 206, 210 (Tex.Crim.App. [Panel Op.] 1979); *Albrecht*

---

**21.** Texas case law governs because Petitioner's trial occurred in June 1984, before the Texas Rules of Criminal Evidence were enacted. Tex. Gov.Code Ann. § 22.109 (Vernon 1988).

*v. State*, 486 S.W.2d 97, 100 (Tex.Crim.App. 1972).

When identity was a "contested, material issue," which it was at Petitioner's trial, an extraneous offense committed by the defendant would be admissible only if the extraneous offense and the primary offense shared sufficient "distinguishing characteristics." [22] *Benavidez v. State*, 670 S.W.2d 297, 299 (Tex.App.—Amarillo 1983); *Vanderbilt v. State*, 629 S.W.2d 709, 716 (Tex.Crim.App.1981); *Walker v. State*, 588 S.W.2d 920, 923 (Tex.Crim.App. [Panel Op.] 1979); *Collins v. State*, 577 S.W.2d 236, 237 (Tex.Crim.App. [Panel Op.] 1979); *Ransom v. State*, 503 S.W.2d 810, 812 (Tex.Crim.App.1974); *Ford v. State*, 484 S.W.2d 727, 729 (Tex.Crim.App.1972). These characteristics had to mark the two offenses as the "handiwork" or "signature" of one person. *Messenger v. State*, 638 S.W.2d 883, 886 (Tex.Crim.App. [Panel Op.] 1982); *see also, Espinoza v. State*, 662 S.W.2d 745, 747 (Tex.App.—Houston [14th Dist.] 1983); *Ford*, 484 S.W.2d at 730. If the two offenses shared such characteristics, an inference could be drawn that, since defendant committed the extraneous offense, he also committed the similarly-executed primary offense. *Benavidez v. State*, 670 S.W.2d 297, 299 (Tex.App.—Amarillo 1983); *Walker v. State*, 588 S.W.2d 920, 924 (Tex.Crim.App. [Panel Op.] 1979); *Collins v. State*, 577 S.W.2d 236, 237 (Tex.Crim.App. [Panel Op.] 1979); *Ran-*

*som v. State*, 503 S.W.2d 810, 812 (Tex. Crim.App.1974); *Ford v. State*, 484 S.W.2d 727, 729 (Tex.Crim.App.1972). When this inference could be drawn, the relevancy of the extraneous offense would outweigh its prejudicial effect. *Collins v. State*, 577 S.W.2d 236, 237 (Tex.Crim.App. [Panel Op.] 1979); *cf., Messenger v. State*, 638 S.W.2d 883, 886 (Tex.Crim.App. [Panel Op.] 1982) (if the similarities are not sufficient, the relevancy of the extraneous offense cannot outweigh its prejudicial effect); *Ford v. State*, 484 S.W.2d 727, 729 (Tex.Crim.App. 1972) (if the similarities are not sufficient, the only purpose in admitting the extraneous offense is an impermissible one: to show that defendant committed some other crime).

Petitioner concedes that identity was the defensive issue at his trial. Pet's Post–Hearing Memo., Dkt. No. 74, pp. 131–132. However, he argues that the Kolenberg crime was not admissible because it and the Haney murder were not sufficiently similar to mark both as the "handiwork" or "signature" of one person. *Id.*, at 132–133. Thus, the Kolenberg crime will be examined to determine whether it shared sufficient similarities with Robert Haney's murder to be admissible under existing Texas precedent.[23]

Evidence of the Kolenberg crime was admitted at the punishment phase of Peti-

---

**22.** Mr. Weiser was correct in his assertion that an alibi would open the door to the Kolenberg crime. Before Petitioner's trial, the Texas Court of Criminal Appeals had held that an alibi placed the defendant's identity in issue; thus, an extraneous offense was admissible if there were "distinguishing characteristics," as discussed in the text. *Dickey v. State*, 646 S.W.2d 232, 233, 234 (Tex.Crim.App.1983) *(en banc)*; *Wintters v. State*, 616 S.W.2d 197, 200 (Tex.Crim.App. [Panel Op.] 1981); *Jones v. State*, 587 S.W.2d 115, 119 (Tex.Crim.App.1978) *(reh'g en banc)*; *Ransom v. State*, 503 S.W.2d 810, 812 (Tex.Crim. App.1974). However, there was authority to the contrary upon which Mr. Weiser could have based the following argument: because the Kolenberg crime occurred in California in September 1982, evidence of that crime did not rebut Carreon's testimony as to Petitioner's whereabouts during the Robert Haney murder on December 7, 1983. *Messenger v. State*, 638 S.W.2d 883, 887 (Tex.Crim.App. [Panel Op.] 1982); *Murphy v. State*, 587 S.W.2d 718, 721 n. 4 (Tex.Crim.App. [Panel Op.] 1979); *Ford v. State*, 484 S.W.2d 727, 730–731 (Tex.Crim.App.1972).

**23.** There is no indication that Mr. Weiser, or the other two defense attorneys, researched the question of similarities. Tr. IV 952–1074 (Mr. Weiser); Sealed Tr. VII 2–77 (Mr. Weiser); Exh. P–67 (defense attorneys' voucher). The only legal research on Mr. Weiser's portion of the voucher which is not described is research on June 15, 1984, labeled "[l]egal research and prepare for trial." Exh. P–67, p. 12. The only research on Mr. Calhoun's portion of the voucher which is not described is "legal research" on June 14, 1984. Exh. P–67, p. 14. On that day, during the hearing on Petitioner's Motion to Suppress the jailhouse confession, the trial court asked for recent cases on that subject. R. XI 103–106. It is likely that Mr. Calhoun's research on that day pertained to the jailhouse confession.

tioner's trial through the testimony of three witnesses: the victim, Frank Kolenberg, one of his neighbors, Rodney Adams, and one of the investigating police officers, Detective Albert Hearn. R. XVI 60–80 (Adams), 80–103 (Detective Hearn), 103–127 (Kolenberg). This testimony disclosed that a few days before September 28, 1982, Mr. Kolenberg hired a neighbor to clean some of his land and the neighbor hired 20 people to do the work. R. XVI 104. Petitioner was one of these people. *Id.*, at 61–62.

On September 28, 1982, shortly after 5:30 p.m., Rodney Adams was working at his brother Larry's garage which was next to Mr. Kolenberg's house. R. XVI 62, 72. Petitioner, carrying a "ballpin" [24] hammer, and his sister, Carmen,[25] walked into the garage. *Id.*, at 62–63. The hammer had come from Larry's garage. *Id.*, at 63, 74. Petitioner asked Rodney what he thought about Mr. Kolenberg and Rodney replied, "He's a pretty nice guy." *Id.*, at 63–64. Petitioner and Carmen left the garage and walked in the direction of Kolenberg's house. *Id.*, at 64, 65. Rodney noticed that his brother's knife and brown knife case were missing from the garage but he did not see Petitioner or Carmen take these items. *Id.*, at 64, 76–77.

Mr. Kolenberg was home with his wife when, at approximately 6:00 p.m., he heard a male voice call his name from outside. R. XVI 105, 107. He went to the front door and stepped onto his porch where he saw a man and a woman. *Id.* The man asked Kolenberg if he had any firewood to which Kolenberg responded "no." *Id.*, at 108. Shortly thereafter, the man "put up his fists" and Kolenberg did the same. *Id.*, at 108–109. Then, while facing the man, Kolenberg felt the first blow to the back of his head. *Id.*, at 109. As he fell against

his station wagon he saw the female, who was hitting him with a hammer, and the man who was kicking him. *Id.*, at 109, 116. At first, the man had no weapon (*Id.*, at 122–123), but later Kolenberg thought the man was hitting him with a two foot long iron bar (*Id.*, at 109, 116, 123). The parts of his body under attack were the back of his head and his arms. *Id.*, at 111. The female was the only one who hit him on the head. *Id.*, at 116–117. Kolenberg fell to the ground and at some point became unconscious. *Id.*, at 111, 112, 116. Before losing consciousness, Kolenberg heard one of the assailants tell Kolenberg's wife that she would be killed if she did not go inside the house. *Id.*, at 112, 122. The assailants took $800 cash which had been in Kolenberg's pants' pocket. *Id.*, at 110–111. Kolenberg suffered a skull fracture, two broken arms, and injuries to his hands which were not severe. *Id.*, at 112, 119. At the time of this incident, Kolenberg was 56 or 57-years-old (*Id.*, at 103, 104) and his wife was 57 or 58-years-old (*Id.*, at 104, 105).

Rodney Adams was still in his brother's garage when he heard five or six thumps. R. XVI 65–66. He walked out of the garage and saw Petitioner and Carmen come from the area between Kolenberg's house and station wagon and then walk down the street. *Id.*, at 66, 68–69. Rodney went to Mr. Kolenberg's house where he saw Kolenberg lying in the doorway with "blood everywhere." *Id.*, at 69.

The only evidence obtained by the police at the scene, other than blood samples, was a knife [26] found in the dirt next to Kolenberg's front door. *Id.*, at 89. The police recovered no fingerprints. *Id.*, at 102. Rodney Adams told the police that Petitioner and Carmen were the assailants.[27] Mr. Kolenberg never gave the police a descrip-

---

24. From Adams' description of this hammer, it was a ballpeen hammer. R. XVI 63.

25. Carmen is also called Yvette Marie. R. XVI 73. In an affidavit, Carmen states that she pled guilty to the Kolenberg crime but Petitioner did not participate in the crime. Exh. P–101. Instead, Larry Adams, Rodney's brother, committed the crime with her. *Id.*

26. According to one of the police reports, this knife had a six inch blade and, when found, it was securely inside its brown leather case. Exh. P–64, pp. 3–4.

27. Rodney named Petitioner and Carmen because he thought that if his brother Larry's knife had been used during the crime, Larry would get blamed for the crime. R. XVI 70, 76–77, 89, 99.

tion of his male assailant[28] nor did he identify Petitioner[29] until Petitioner's trial when Kolenberg was asked, for the second time, to identify his assailant.[30] *Id.*, at 8, 11–13, 16–20, 25–27, 33–37, 123–125.

The "distinguishing characteristics" which render an extraneous offense admissible can be either (1) "proximity in time and place" of the two offenses, (2) the perpetrator's mode of dress during the two crimes, or (3) the method of committing the two crimes.[31] *Lewis v. State*, 674 S.W.2d 423, 425 (Tex.App.—Dallas 1984, *pet. ref'd*); *Ford v. State*, 484 S.W.2d 727, 730 (Tex.Crim.App.1972); *see also, Benavidez v. State*, 670 S.W.2d 297, 300 (Tex.App.—Amarillo 1983); *Walker v. State*, 588 S.W.2d 920, 924 (Tex.Crim.App. [Panel Op.] 1979); *Ransom v. State*, 503 S.W.2d 810, 813 (Tex.Crim.App.1974). Here, there is no proximity in time or place. The Haney murder was committed in El Paso, in the middle of the day, on December 7, 1983. The Kolenberg crime was committed more than a year earlier, in California, in the early evening hours. *See Espinoza v. State*, 662 S.W.2d 745, 746, 747 (Tex.App.—Houston [14th Dist.] 1983) (there was no

proximity in time or place because the primary offense was committed in Houston in September 1981 and the extraneous offense was committed in Ft. Worth in July 1981); *cf., Messenger v. State*, 638 S.W.2d 883, 885 (Tex.Crim.App. [Panel Op.] 1982) (proximity existed because the two extraneous offenses occurred within a four-block radius of the charged offense and all three offenses occurred within three weeks of each other); *Walker v. State*, 588 S.W.2d 920, 924 (Tex.Crim.App. [Panel Op.] 1979) (proximity existed because the six extraneous offenses and the charged offense all took place at night, in the same area, within one month). And, there is no indication of a similar distinguishing mode of dress during both offenses. Petitioner's clothes during the Haney murder were described as jeans, work boots, and a "cholo"-type shirt with blue and gray checks, or a solid light blue shirt, or a denim jacket. R. XII 99, 131–132, 170; R. XIII 327, 337, 412, 420–421, 432. There was no description of the clothes worn by Petitioner during the Kolenberg crime. *See* R. XVI 21, 110.

Although there are similarities in the method of committing the two crimes,

**28.** R. XVI 6–7, 95. However, at a hearing in California, Mr. Kolenberg described his male assailant as "white" (*Id.*, at 121) and, at Petitioner's trial, testified that the male assailant did not wear glasses (*Id.*, at 125). Petitioner has worn glasses since he was 10 or 12 years old. Tr. IV 1182; Tr. V 1666–1667, 1688.

**29.** Approximately one week after the crime, Mr. Kolenberg was unable to select Petitioner's photograph from a photo-spread. R. XVI 4–6, 16–17, 94–95, 98. The police did not use any other identification procedure with Mr. Kolenberg. *Id.*, at 5–6.

**30.** Mr. Weiser challenged Mr. Kolenberg's anticipated in-court identification of Petitioner by asking for a line-up (R. XVI 3, 29–30) and moving to suppress any in-court identification because Kolenberg had previously failed to identify Petitioner (*Id.*, at 9–10). Both requests were denied. *Id.*, at 3, 11. However, the trial court granted Mr. Weiser's request to *voir dire* Mr. Kolenberg outside the presence of the jury concerning his ability to identify Petitioner (*Id.*, at 2–3) and to move Petitioner from counsel table during this procedure (*Id.*, at 10–11). Thus, before Mr. Kolenberg entered the courtroom to testify on *voir dire*, Petitioner moved to a location behind counsel table where he sat with two

men. R. XVI 11–13, 25–26. Left at counsel table were defense attorneys Gary Weiser and John Calhoun. *Id.*, at 22–23, 25–26. When Mr. Kolenberg was asked, for the first time, to identify his assailant, he selected defense attorney John Calhoun. *Id.*, at 17–18, 25–27, 36–37.

**31.** *Lewis* and *Ford* describe as a fourth category "any other element which marks both crimes as having been committed by the same person." *Lewis v. State*, 674 S.W.2d 423, 425 (Tex.App.—Dallas 1984, *pet. ref'd*); *Ford v. State*, 484 S.W.2d 727, 730 (Tex.Crim.App.1972). These cases do not elaborate on what characteristics would be included in this category. The only characteristics in these two cases which *might* be put in a category other than the three listed in the text are the type of victim, *Lewis*, 674 S.W.2d at 426, 427, and the number of perpetrators, *Ford*, 484 S.W.2d at 730. However, both of these characteristics *seem* to fall within the method-of-committing-the-crime category because both are discussed in cases which list this category but not the "any-other-element" category. *See Benavidez v. State*, 670 S.W.2d 297, 299, 300 (Tex.App.—Amarillo 1983); *Walker v. State*, 588 S.W.2d 920, 924 (Tex.Crim.App. [Panel Op.] 1979); *Collins v. State*, 577 S.W.2d 236, 238 (Tex.Crim.App. [Panel Op.] 1979); *Ransom v. State*, 503 S.W.2d 810, 813 (Tex.Crim.App.1974).

there are also significant differences. The similarities are that the victims were older men[32] who were at home with their wives when the offenses occurred.[33] Two actors perpetrated each offense and both of Petitioner's co-defendants are younger than he.[34] Petitioner had worked for both Mr. Haney and Mr. Kolenberg but the two relationships were substantially different. For a number of months, Petitioner had contracted directly with Mr. Haney to do various jobs around the Haney house. Mr. Kolenberg did not hire Petitioner. A neighbor hired Petitioner once, along with a number of other people, to clean Mr. Kolenberg's yard. Petitioner and his family socialized with the Haneys. There is no indication of any socializing between Mr. Kolenberg and Petitioner or his family. R. XVI 60–80 (Adams), 103–127 (Kolenberg).[35] Both crime scenes were described as very bloody. However, a bloody crime scene would result any time a victim is struck repeatedly with a sharp or heavy instrument. *See Collazo v. State,* 623 S.W.2d 647, 649 (Tex.Crim.App. [Panel Op.] 1981);

*Ford v. State,* 484 S.W.2d 727, 730 (Tex. Crim.App.1972). Thus, it is not a distinctive feature of the two offenses. *Id.*

Finally, the prosecutors argued that Petitioner (1) was having problems with his wife before each crime, (2) left town after each crime resulting in his co-defendants' "holding the bag," and (3) refused to turn himself in after learning that he was wanted in each case. R. XVI 214. Leaving town and leaving his co-defendants "holding the bag" are "merely two ways of characterizing the same evidence." *Collazo v. State,* 623 S.W.2d 647, 649 n. 4 (Tex. Crim.App. [Panel Op.] 1981). If Petitioner left town and his co-defendants did not, the co-defendants would be left "holding the bag." More importantly, these three similarities were unknown to the prosecutors during the guilt/innocence stage and thus, could not have been argued as similarities during that stage. Although the prosecutors knew, before trial, that Petitioner was having domestic problems before the Haney murder (Exh. P–55; *see also,* Def. Exh.

**32.** As stated above, Mr. Kolenberg was either 56 or 57–years-old at the time of the attack on him. R. XVI 103, 104. Mr. Haney was 48–years–old when he was killed but the medical examiner stated that he appeared much older. R. XIII 468; R. XIV 856. Although a ten-year age difference may not necessarily be a similarity, the ages of the victims will be deemed similar since Mr. Haney appeared older than 48 years.

**33.** This similarity and others were noted by the prosecutors in their final arguments at the sentencing phase of Petitioner's trial. R. XVI 194, 195, 196, 197, 200, 201, 213, 214. Had the admissibility of the Kolenberg crime been an issue at the guilt/innocence phase, it is likely that the prosecutors would have asserted these similarities in their arguments to the court. The discussion in the text covers all but two of the points argued by the prosecutors, with some of their points in the list of similarities and others in the list of dissimilarities. The two points not discussed in the text are the failure to recover fingerprints at the scene of each crime and the failure to recover bloody clothing belonging to the perpetrators of each crime. R. XVI 214.

In June 1984, there was Texas precedent indicating that these factors were not the kind of distinctive characteristics necessary for the admission of an extraneous offense. The recovery of fingerprints is often a fortuitous event and cannot be classified as a method of committing a crime unless it is shown that the perpetrator

used gloves or some other device for the purpose of avoiding fingerprint evidence. *See Vanderbilt v. State,* 629 S.W.2d 709, 714, 716 (Tex. Crim.App.1981) (the absence of fingerprints was deemed a similarity where defendant, an ex-police officer, used gloves to wipe off the steering wheel and gear shift lever in one victim's car and left no fingerprints in or on the other victim's car); *see also, Collazo v. State,* 623 S.W.2d 647, 648–649 (Tex.Crim.App. [Panel Op.] 1981) (look at the acts of the perpetrator rather than a description of the crime that would apply to all similar crimes). There is no indication that Petitioner used gloves or other precautions for this purpose. Similarly, the failure to recover bloody clothing may be attributable to the activities of the police and cannot be deemed a method of committing a crime unless it is shown that, after the crime, the perpetrator cleaned, hid, or destroyed his bloody clothing. *Id.* There is no such evidence regarding either the Kolenberg crime or the Haney murder.

**34.** Petitioner was born in October 1952. Exh. P–69, p. 5. Thus, at the time of the Haney murder he was 31–years–old and Luevanos was 19–years–old. R. XII 91–92. Carmen Macias is one of Petitioner's younger sisters. Tr. IV 1196–1202.

**35.** *See also,* R. XVI 150, where Petitioner states that he had seen Mr. Kolenberg only a few times.

5), they did not know he was having such problems before the Kolenberg crime. They first heard this fact at the punishment stage when Petitioner said it. R. XVI 148, 153, 172–173. Although the prosecutors knew, before trial, that Petitioner left town right after the Haney murder (Def. Exh. 5; Exh. P–55), they did not know he left town after the Kolenberg crime. They first heard information on this subject at the punishment stage when Petitioner's wife testified that Petitioner came to Texas approximately two months after the Kolenberg crime.[36] R. XVI 143–144. And, it was during the punishment phase that prosecutors first learned that Petitioner knew he was wanted in both cases but did not turn himself in.[37] R. XVI 143–144, 144–145, 170, 173–175, 178–179. Thus, the prosecutors could not have classified these three features as similarities during the guilt/innocence phase of trial.

The dissimilarities are significant. In El Paso, the perpetrators arrived at the scene of the crime in a car. In California, they arrived on foot. In El Paso, the perpetrators drove around the Haney house a number of times and Petitioner got out of the car apparently to scout the Haneys' house. In California, the perpetrators did not walk around the Kolenberg house nor did they scout Mr. Kolenberg's property. In El Paso, they knocked on the front door and pushed their way into the house when Mr. Haney answered the door. In California,

while standing at Mr. Kolenberg's front door, they called out his first name and stayed on his porch when he answered the door. In El Paso, Petitioner tried to conceal his identity by putting a paper bag over his head. In California, neither perpetrator made any attempt to conceal his or her identity.[38] In El Paso, the crime was committed inside the house. In California, it was committed outside the house. In El Paso, the perpetrators first tied up the victim. In California, the perpetrators never tied up the victim.[39] In El Paso, Mr. Haney's wife was also tied up and murdered. In California, Mr. Kolenberg's wife was verbally threatened but there is no indication that she was assaulted. In El Paso, after tying up the victim and his wife, the perpetrators looked for things to steal and took pistols, bullet shells, coins, a watch, and a wallet. R. XII 125, 134–135, 144–145, 146, 148, 193, 195–196, 201, 206–208. Then they killed the victim and his wife. Thus, in El Paso, the robbery preceded the murder. In California, the male assailant first fought, or threatened to fight, Mr. Kolenberg with his fists and then the two assailants hit the victim and knocked him unconscious. Thereafter, they took $800 cash from his pants' pocket. Thus, in California, the assault preceded the robbery.[40] In El Paso, Petitioner hit Mr. Haney in the head with a machete. In California, the co-defendant, rather than Petitioner, struck all the blows to Mr. Kolenberg's head. In El Paso, the perpetra-

36. At the punishment phase, Petitioner said that he left town before the Kolenberg crime and he denied any involvement in the crime. R. XVI 149–150, 170.

37. Failing to turn oneself in and leaving town after the commission of a crime are not distinctive acts. Most people charged with crimes do not turn themselves in and many such people leave town. See Messenger v. State, 638 S.W.2d 883, 886–887 (Tex.Crim.App. [Panel Op.] 1982) (that defendant entered the victims' houses at night when no man was present displayed an expected degree of caution and is not distinctive).

38. Cf., Lewis v. State, 674 S.W.2d 423, 426, 427 (Tex.App.—Dallas 1984, pet. ref'd) (in each of three offenses, defendant attempted to conceal his identity with a T-shirt, a sweatshirt, and a ski mask).

39. See Walker v. State, 588 S.W.2d 920, 924 (Tex.Crim.App. [Panel Op.] 1979) (one similarity was that the victims were tied in the same manner); cf., Espinoza v. State, 662 S.W.2d 745, 747 (Tex.App.—Houston [14th Dist.] 1983) (tying the two sets of victims with the husbands' neckties was not distinctive).

40. See Lewis v. State, 674 S.W.2d 423, 426, 427 (Tex.App.—Dallas 1984, pet. ref'd) (one similarity was that oral sodomy preceded rape in each offense); Benavidez v. State, 670 S.W.2d 297, 299–300 (Tex.App.—Amarillo 1983) (the sequence of events was the same in each offense: defendant told the store clerk to put money from the cash register into a paper bag and then lie on the floor behind the counter); Walker v. State, 588 S.W.2d 920, 924 (Tex.Crim.App. [Panel Op.] 1979) (one similarity was that robbery preceded rape in each offense).

tors used a weapon they found at the scene. In California, if Petitioner used an iron bar, there is no indication as to where he got it; if Carmen used a ballpeen hammer, she did not obtain it at Kolenberg's home. She got it from Rodney's brother's garage at an undisclosed time. In El Paso, the perpetrators took the murder weapon from the scene and later Luevanos buried it in his back yard. In California, there was no testimony as to what was done with the ballpeen hammer or the iron bar.

In summary, the dissimilarities pervade the commission of the two crimes. And the similarities are few: (1) the victims were older men (2) who were at home with their wives at the time of the offense; (3) each crime was committed by two assailants; and (4) Petitioner's co-defendants are younger than he. The existence of these similarities, alone, did not render the Kolenberg crime admissible. *Ford v. State*, 484 S.W.2d 727, 730 (Tex.Crim.App.1972). Rather, the question was whether these four factors are so " 'unusual and distinctive as to be like a signature.' " *Collazo v. State*, 623 S.W.2d 647, 648 (Tex.Crim.App. [Panel Op.] 1981).

The similarities boil down to a description of the victims and a description of the perpetrators. Although the kinds of victims and perpetrators were often relied on as distinguishing characteristics, *Lewis v. State*, 674 S.W.2d 423, 426, 427 (Tex.App.— Dallas 1984, *pet. ref'd*) (victims); *Benavidez v. State*, 670 S.W.2d 297, 299–300 (Tex. App.—Amarillo 1983) (victims and perpetrators); *Dickey v. State*, 646 S.W.2d 232, 233, 234 (Tex.Crim.App.1983) (*en banc*) (victims), *conc. op.* at 235 (victims and perpetrators); *Messenger v. State*, 638 S.W.2d 883, 886 (Tex.Crim.App. [Panel Op.] 1982) (victims); *Vanderbilt v. State*, 629 S.W.2d 709, 716 (Tex.Crim.App.1981) (victims); *Wintters v. State*, 616 S.W.2d 197, 200 (Tex.Crim.App. [Panel Op.] 1981) (victims and perpetrators); *Walker v. State*, 588 S.W.2d 920, 924 (Tex.Crim.App. [Panel Op.] 1979) (perpetrators); *Collins v. State*, 577 S.W.2d 236, 237–238 (Tex.Crim.App. [Panel Op.] 1979) (victims and perpetrators); *Jones v. State*, 587 S.W.2d 115, 120 (Tex.Crim.App.1978) (*reh'g en banc*) (vic-

tims); *Ransom v. State*, 503 S.W.2d 810, 813 (Tex.Crim.App.1974) (perpetrators); *cf.*, *Collazo v. State*, 623 S.W.2d 647, 649 (Tex. Crim.App. [Panel Op.] 1981) (similar age of the two victims plus the fact that both were returning to their cars in public places were not deemed distinctive), in none of the cases were these two factors, alone, sufficient for the admission of an extraneous offense. *Id.; see also, Espinoza v. State*, 662 S.W.2d 745, 747–748 (Tex.App.— Houston [14th Dist.] 1983); *Lusk v. State*, 511 S.W.2d 279, 280 (Tex.Crim.App.1974); *Ford v. State*, 484 S.W.2d 727, 730 (Tex. Crim.App.1972).

The above discussion discloses that there was Texas precedent on which defense counsel could have relied for the proposition that the Kolenberg crime was not admissible at the guilt/innocence phase. Thus, fear of the admission of the Kolenberg crime did not justify the failure to use Mr. Carreon's alibi testimony.

3. Carreon's Story, His Credibility, and His Criminal Record

Mr. Weiser testified that the "one and one-half hour" gap in Carreon's alibi testimony was a reason for not using his testimony. Tr. IV 1028–1029; Sealed Tr. VII 53. He also stated that he could "almost live with" this gap because the alibi testimony put Petitioner far away from the Haney residence. Sealed Tr. VII 53. The latter statement is an accurate assessment of the facts.

Mr. Carreon would have testified that Petitioner left the convenience store in Carreon's pickup at 9:30 a.m. and returned to the convenience store at 11:30 or 11:45 a.m., creating a gap of two or two and one-fourth hours. Exh. P–56. Luevanos testified that he and Petitioner began drinking at 9:00 a.m. (R. XII 101, 184–185), got inside the Haney house at around noon, stayed in the house for 20 to 25 minutes (*Id.*, at 198–199), and got back to the convenience store at 2:00 p.m. (*Id.*, at 200). Thus, Luevanos was committed to the proposition that he was with Petitioner from 9:00 a.m. to 2:00 p.m. This testimony could not be true if one believed Carreon's testi-

mony. In addition, Mr. and Mrs. Monteros testified about the length of time spent by Luevanos and his cohort driving around the Haney house. Mrs. Monteros said that she first saw Luevanos' car at about 10:00 a.m. and thereafter she watched him make five trips through the alley. R. XIII 416–417, 422–423. When her husband got home at 11:15 or 11:30 a.m. (*Id.*, at 398, 416–417), Luevanos was in the alley and asked whether he could urinate there (*Id.*, at 398). Petitioner could not have been with Luevanos in the alley at 11:15 a.m., then have entered the Haney house and stayed for 20 to 25 minutes while committing the murder, and gotten back to the Quik 'N Easy store in Canutillo, Texas with Carreon's pickup by 11:45 a.m. Trial testimony disclosed that one of the routes from the Haney house to Canutillo took 26 minutes to drive and the other route took 21 minutes to drive. R. XIV 911–912. Thus, as Mr. Weiser stated, the gap in Carreon's testimony did not pose any real problems.[41] *See Nealy v. Cabana*, 764 F.2d 1173, 1179 (5th Cir.1985) (the testimony of a witness who should have been called would have left a 30–minute gap, which was not enough time to plan and commit the crime).

 After conceding this point, Mr. Weiser stated that he did not use Carreon because when Mr. Weiser and his investigator, Cecil Ming, talked to Carreon,[42] Carreon's statement was not consistent with the earlier statement Carreon had given Mr. Ming (Exh. P–56). Sealed Tr. VII 53–54; *see also*, Tr. IV 1029. In short, Mr. Weiser deemed Carreon a "flake." Sealed Tr. VII 54. However, Mr. Weiser had no recollection as to how Carreon's second statement was inconsistent with his first. *Id.* In light of Mr. Weiser's lack of specificity and Mr. Ming's recollection that, at the meeting with Mr. Weiser, Carreon verified his earlier statement (Exh. P–85, para. 4),[43] this court cannot accept Mr. Weiser's assessment of Mr. Carreon's credibility. *See Sullivan v. Fairman*, 819 F.2d 1382, 1386–1387, 1392–1393 (7th Cir.1987) (Court disagrees with defense attorney's assessment of the credibility of uncalled witnesses). Thus, lack of credibility did not justify the failure to call Carreon. *Id.*

 Finally, Mr. Weiser did not use Carreon's testimony because of Carreon's criminal record.[44] Tr. IV 1029; Sealed Tr. VII 54. Obviously, all of Mr. Carreon's final convictions[45] were admissible and the State could have argued that Carreon's tes-

**41.** Mr. Weiser also stated that, in order to make the alibi work, he would have to put Petitioner on the stand to explain his whereabouts during the gap. Tr. IV 1029; Sealed Tr. VII 19–20. He did not want to put Petitioner on the stand because that would have opened the door to his criminal record at the guilt/innocence phase (Sealed Tr. VII 19–20) and he did not have Petitioner's permission to do so (Tr. IV 1029). The discussion concerning the gap in the text, *supra*, discloses that there was no need to put Petitioner on the stand to explain his whereabouts during the gap.

**42.** The defense attorneys' voucher shows that Mr. Weiser's interview with Carreon occurred on May 29, 1984. Exh. P–67, p. 12. At that time, neither the defense nor the State had discovered Jennifer Flores and her damaging testimony. Exh. P–85, pp. 2–3 & Attach. B; R. XII 278, 282; Exh. P–140. Thus, the need for Carreon's testimony on May 29, 1984 was not as great as it was after the discovery of Jennifer. There is no indication as to whether Mr. Weiser re-evaluated the need for Carreon's testimony after the defense found Jennifer Flores on June 1, 1984 or after the State found her on June 16, 1984.

**43.** On July 6, 1988, Carreon reaffirmed his statement to Mr. Ming by signing it again (Exh. P–56, p. 4); and at the habeas hearing Carreon verified that this statement was true and correct (Tr. IV 1088–1090).

**44.** Carreon's "rap" sheet is in evidence (Exh. P–58) along with documents concerning his federal conviction (Exh. P–57; Exh. P–59; Exh. P–60; Exh. P–61). He has a 1981 federal conviction for theft of postal property for which he received probation. Exh. P–57; Exh. P–59; Exh. P–60; Tr. IV 1091–1098. Shortly before Petitioner's trial in 1984, Carreon's probation was revoked based on Carreon's admissions, *inter alia*, that he drank beer and drove a vehicle while intoxicated and while his driver's license was suspended. Exh. P–60. The rest of his criminal history consists of three arrests for driving while intoxicated: one in May 1982, one in January 1983, and one in November 1983. Exh. P–58.

**45.** He had one federal felony conviction and, at the most, three convictions for driving while intoxicated. *See supra*, footnote 44.

timony was thereby impeached. *Murphy v. State*, 587 S.W.2d 718, 722 (Tex.Crim. App. [Panel Op.] 1979). However, Carreon was sworn in and placed under the rule as a State witness; and prosecutor Moody, in his opening statement to the jury, identified Carreon as a witness for the State. R. XII 65–66, 88. Therefore, any attempt by the prosecutors to discredit Carreon would have been nullified by pointing out, and elaborating on, the fact that the State had vouched for his credibility. And, the obvious argument could have been made that the jury, having heard Carreon's testimony, now knows why the State did not use him. Thus, Carreon's criminal record did not justify the failure to call him as an alibi witness.

### 4. Problems with Petitioner's Wife's Alibi Testimony

Mr. Weiser said that he did not present Carreon's alibi testimony because, in order to do that, he would have to use the problematical testimony of Petitioner's wife, Janet Macias. Tr. IV 1038; Sealed Tr. VII 18, 20–21, 51, 52–53. The difficulties Mr. Weiser found in Janet's testimony were that she gave three different stories and none of them jibed with Carreon's testimony (Sealed Tr. VII 18, 51–53); the Carreon gap got larger with Janet's testimony (*Id.*, at 20–21); and she could not provide a good alibi for December 7, 1983 (*Id.*, at 51).[46] Thus, Petitioner told Mr. Weiser not to use Janet. *Id.*, at 18. Furthermore, Mr. Weiser believed that use of Janet's testimony would open the door to "certain extraneous offenses"[47] at the guilt/innocence stage. *Id.* None of these reasons matters because Carreon's alibi testimony was presentable and credible without support from Janet. *See Sullivan v. Fairman*, 819 F.2d 1382, 1386, 1392–1393 (7th Cir.1987) (defense at-

torney's assessment of the credibility of uncalled witnesses was not correct).

The failure to use Carreon's alibi testimony cannot be considered "reasonable" because Mr. Weiser's justifications for this failure are not viable. *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); *Bouchillon v. Collins*, 907 F.2d 589, 596–597 (5th Cir.1990); *Harris v. Reed*, 894 F.2d 871, 876, 878 (7th Cir.1990). Thus, this failure constitutes deficient performance. *Id.*

Because Carreon's alibi testimony was consistent with the Monteros' failure to identify Petitioner as the passenger and because Carreon's testimony rebutted Luevanos' identification of Petitioner as the perpetrator, there is a "reasonable probability" that Carreon's testimony would have resulted in a verdict of not guilty. *Strickland v. Washington*, 466 U.S. 668, .694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984); *Harris v. Reed*, 894 F.2d 871, 879 (7th Cir.1990); *Sullivan v. Fairman*, 819 F.2d 1382, 1392–1393 (7th Cir.1987); *Nealy v. Cabana*, 764 F.2d 1173, 1179–1180 (5th Cir.1985). The jury's difficulty in reaching a verdict is further indication that Carreon's alibi testimony would have made a difference in the outcome. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *Blackburn v. Foltz*, 828 F.2d 1177, 1178, 1186 (6th Cir.1987), *cert. denied*, 485 U.S. 970, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988); *Woodard v. Sargent*, 806 F.2d 153, 157–158 (8th Cir.1986).

### C. Failure to Rebut Jennifer Flores' Testimony

#### 1. Finding Jennifer Flores

Jennifer Flores was first discovered as a potential witness on June 1, 1984, three days before jury selection began. R. III 2;

---

**46.** The discussion in the text assumes that Mr. Weiser's criticisms of Janet's testimony are accurate. Janet's testimony at the habeas hearing in this court indicates otherwise. She testified that she did not work on December 7, 1983 and that the events of that day occurred much like those described by Carreon. Tr. V 1513–1520, 1577–1581; *see* Exh. P-85, p. 4 (Cecil Ming confirms that he helped Janet obtain records showing that she did not work on December 7, 1983).

However, in an affidavit dated September 2, 1988, Janet tells a story different from Carreon's. Exh. P-97. Here she states that she and Petitioner stayed home most of the day although Petitioner left for short periods of time. *Id.*

**47.** Although Mr. Weiser used the plural, there is no evidence of any extraneous offense other than the Kolenberg crime discussed *supra*.

Exh. P–33A. On that day, defense investigator Cecil Ming was in Canutillo, Texas to interview Loretta Smith. Exh. P–33A. While waiting for her, two children rode up on their bicycles. *Id.* One of these children was Jennifer Flores and the other was Mrs. Smith's son. *Id.* Mr. Ming asked if the children knew where Petitioner's family had lived. *Id.* Jennifer pointed to a mobile home, said that she knew the family well, and began telling the following story. *Id.* One day her dog got loose and ran to Petitioner's trailer. *Id.* She and Petitioner's daughter, Missy,[48] chased the dog to some bushes next to the porch on Petitioner's trailer. *Id.* While on the porch, Jennifer looked through the bathroom window and saw Petitioner washing blood off his hands, his shirt, and a long gun. *Id.* Petitioner said that he had borrowed the gun from Mr. Haney and was going to take it back. *Id.* Jennifer did not know what Petitioner did with the gun. *Id.* The last time Jennifer saw Petitioner was when he left the trailer and walked into the desert. *Id.*

Mr. Ming did two more pertinent things that day. First, he went to Petitioner's trailer to see if Jennifer could have looked through the bathroom window from the outside. Exh. P–85; Exh. P–139. He determined that a view through the bathroom window was impossible.[49] *Id.* Next, he returned to Jennifer's house near the end of the day to talk to her mother. Exh. P–33A. When Mrs. Flores arrived, Mr. Ming told her that he wanted to discuss the story

he had heard from Jennifer. *Id.* Mrs. Flores said that Jennifer called her at work that morning and told her the story. *Id.* That was the first time Mrs. Flores had heard the story and she did not know whether it was true. *Id.* She stated that Jennifer was "very imaginative"[50] and she did not always know where Jennifer obtained her stories. *Id.* Mrs. Flores disclosed that she had helped Petitioner get his job at Baltimore Spice Company but when she heard that Petitioner had said he was going to "screw" her, she spoke with Petitioner and "put him in his place."[51] *Id.*

Mr. Ming told Mrs. Flores that he needed to know whether Jennifer's story was true. Exh. P–33A. Mrs. Flores agreed to talk to Jennifer to determine the truthfulness of the story and took Mr. Ming's card so that she could call him. *Id.* Mr. Ming never got a response from Mrs. Flores. The next night when he called, Mrs. Flores said that she had not had an opportunity to talk with Jennifer. *Id.* On Monday night (June 4, 1984), he called again and spoke with a female who said that Mrs. Flores was out and would not be back until late that night. *Id.* There was no further contact between Mr. Ming and Mrs. Flores. *Id.* When Mr. Ming got back to El Paso after speaking with Jennifer on June 1, 1984, he relayed Jennifer's story to Mr. Weiser. Exh. P–139; Tr. IV 988–989.

The State first learned of Jennifer on June 15, 1984 when a neighbor, Raejeanne,

**48.** Actually, Missy is Petitioner's stepdaughter. Tr. V 1498. When Petitioner met his wife, Janet, she had three children from a prior marriage: Kathy Garcia, Victoria (nicknamed Missy) Garcia, and Pedro Garcia. Tr. V 1498, 1628. Petitioner and Janet had one daughter together, Teresa Macias. *Id.,* at 1501. This opinion will not distinguish between Petitioner's child and stepchildren; all will be called Petitioner's "children," "child," etc.

**49.** Petitioner's habeas attorneys hired investigator Freddie Bonilla to investigate this and other questions concerning Jennifer's stories. Tr. III 865–877; *see also,* Exh. P–93, p. 4 (diagram of Petitioner's trailer). His investigation confirmed that Jennifer could not have looked through the bathroom window. If Jennifer had been standing on the back porch (Tr. III 873–875; Exh. P–38), the bathroom on that side of

the trailer was inside a bedroom at the other end of the trailer (Exh. P–93, p. 4) and there is no evidence that this bathroom had a window (*see* Tr. III 863–888). If there were a front porch and if Jennifer had been standing on it, the bathroom window on that side of the trailer was frosted, 11 to 12 feet off the ground, and a number of feet away from the front door. Tr. III 875–877, 885–886; Exh. P–39; Exh. P–93, p. 4. There was no indication that this bathroom window had been altered since December 7, 1983. Tr. III 877–888.

**50.** This is a quote from Mr. Ming's notes. Exh. P–33A. His notes do not disclose whether these were Mrs. Flores' exact words or Mr. Ming's summary of her words. *Id.*

**51.** See *supra,* footnote 50.

told a District Attorney investigator, Gonzalo Garcia, that Jennifer spent the night of Tuesday, December 6, 1983, at Petitioner's house. R. XII 278–280; Exh. P–140.[52] Investigator Garcia first interviewed Jennifer and her mother on Saturday, June 16, 1984. R. XII 278, 282; Exh. P–140. By this time, Jennifer's story had changed. Now her story began with her spending a Tuesday night at Petitioner's trailer. Exh. P–140. Mrs. Flores interrupted to say that the Tuesday was December 6, 1983 because that was the first day Petitioner missed work at Baltimore Spice, where Mrs. Flores also worked. *Id.*

Jennifer said that she arrived at Petitioner's trailer after school at 3:00 p.m. and was inside the trailer when Petitioner came home at about 4:00 p.m., carrying his shirt over his shoulder and a "rifle gun." Exh. P–140. Jennifer claimed that Petitioner's daughter, Kathy, saw Petitioner wash blood from his hands and that Jennifer saw spots of blood on the front of Petitioner's shirt. *Id.* Jennifer did not see blood on Petitioner's hands because he had already put soap on his hands. *Id.* Petitioner left the trailer and walked into the desert carrying his bloody shirt and the gun. *Id.*

Investigator Garcia typed his notes on Sunday, June 17, 1984, and thus created Exhibit P–140 which he left in the District Attorney's office for prosecutor Moody to see. R. XII 271–274, 277–278, 285, 287–288, 290. At 8:00 a.m. on Monday, June 18, 1984, Moody disclosed Jennifer's and her mother's statements to Mr. Weiser. R. XII 19–20. June 18, 1984 was the first day evidence was presented at Petitioner's trial. R. XII 2, 21–22. Thus, Mr. Weiser learned that the State had found Jennifer one hour

before the evidence was scheduled to begin. R. XII 21–22.

### 2. Mr. Weiser's Response to the State's Discovery of Jennifer Flores

Mr. Weiser immediately requested a mistrial or the suppression of Jennifer's testimony because the late disclosure of her statement prevented him from preparing a response. R. XII 18–23. Prosecutor Moody then took the stand to say that he first learned of Jennifer's statement on Sunday night, June 17, 1984, at 9:00 p.m. when he went to his office. *Id.,* at 25. The trial court denied Mr. Weiser's motion to suppress and his motion for mistrial. *Id.,* at 43. The next day, on June 19, 1984, the court heard the testimony of investigator Garcia on this subject (*Id.,* at 269–291) and again denied Mr. Weiser's motion to suppress and motion for mistrial (*Id.,* at 294). Immediately thereafter, the State announced it was ready to put Jennifer on the stand in front of the jury. *Id.*

Sometime between this moment and 8:00 a.m. the day before, Mr. Weiser had contacted a child psychologist named Dr. Walker for expert testimony concerning the suggestibility of Jennifer Flores. R. XII 295; Tr. IV 990, 992–993. When the State was ready to call Jennifer to the stand, Mr. Weiser requested two things: a hearing outside the presence of the jury to determine Jennifer's competency[53] and authorization to hire Dr. Walker to observe Jennifer testify so that Dr. Walker could provide expert testimony about the suggestibility of children and of Jennifer in particular. R. XII 294–295, 297. Mr. Weiser also requested a 15–minute recess while Dr. Walker traveled to the courthouse so that he could observe Jennifer testify out-

---

**52.** Exhibit P–140, admitted at the habeas hearing is the same as Defendant Exhibit 2 admitted at Petitioner's trial. R. XII 20–21, 291. These two exhibits consist of a two-page Supplementary Offense Report typed by Gonzalo Garcia on June 17, 1984, two pages of a statement by Lucy Flores in her own handwriting, and three pages of investigator Garcia's handwritten notes taken during his interview with Jennifer. R. XII 285, 290; Tr. VI 2011–2013, 2020–2023. Each of the latter three pages was signed by Jennifer on June 16, 1984. R. XII 282; Tr. VI 2009.

**53.** The trial judge was authorized to examine children to determine whether they possessed "sufficient intellect to relate transactions" and whether they understood "the obligation of an oath." Tex.Code Crim.Proc.Ann. art. 38.06 (Vernon 1965). As stated in the text, *infra,* the trial judge briefly questioned Jennifer pursuant to this provision. R. XIII 313–317. And, at Mr. Weiser's request, the trial judge explained hearsay to Jennifer, telling her that she could only state what she saw. R. XIII 319–320.

**808**

side the presence of the jury. *Id.*, at 295, 298–299. The court denied the request to have Dr. Walker observe Jennifer testify but granted the request for the court to conduct a competency determination outside the presence of the jury. *Id.*, at 298, 300, 303; R. XIII 312, 313.

After briefly questioning Jennifer (R. XIII 313–317), the court allowed her to testify before the jury (*Id.*, at 317–318, 321, 322–357). Thus, if the court had allowed it, Mr. Weiser could have used Dr. Walker only to present generic testimony concerning the suggestibility of children. R. XII 303. The court withheld a ruling on the use of Dr. Walker for this purpose as well as a ruling on whether the county would pay Dr. Walker for his time. *Id.* Mr. Weiser never asked for a ruling on the admissibility of Dr. Walker's generic testimony and never attempted to use Dr. Walker for this or any other purpose. R. XV 960–990. Thus, the only trial testimony concerning Jennifer's story came from Jennifer and her mother.

Mr. Weiser did one more thing in response to the State's discovery of Jennifer. He sent defense attorney Calhoun and investigator Ming to Canutillo to talk to Jennifer. Exh. P–85; Exh. P–139. When told that Jennifer was not at home, attorney Calhoun decided not to wait to see her. *Id.* Thus, the only defense contact with Jennifer occurred on June 1, 1984 when Mr. Ming interviewed her.

3. The Trial Testimony of Jennifer and Her Mother

At trial Jennifer told a story similar to the one she had told investigator Garcia,

with a few significant differences. R. XIII 322–357. She spent the night at Petitioner's trailer with his three daughters, Kathy, Missy, and Teresa. *Id.*, at 324. Jennifer's dog was also at the trailer. *Id.* Again, she saw a few spots of blood on Petitioner's shirt. *Id.*, at 326, 341. Now, Jennifer, as well as Kathy, saw Petitioner in the bathroom (*Id.*, at 338–339) and Jennifer, as well as Kathy, saw blood on Petitioner's hands (*Id.*, at 341).[54] Again, Petitioner had a gun which was, or looked like, the gun labeled State Exhibit 6.[55] *Id.*, at 328. Now, Jennifer saw Petitioner look out the bathroom window[56] and act nervous. *Id.*, at 330. After seeing Petitioner in the bathroom, Jennifer went outside to chase her dog. *Id.* While outside she saw Petitioner walk into the desert carrying his shirt and the gun. *Id.*, at 330–331.

Mrs. Flores then testified that the night to which Jennifer was referring was *Wednesday, December 7, 1983.* R. XIII 379–381. In this version, she remembered the date because this was the *second day* Petitioner missed work that week. *Id.*, at 379–381, 392. On cross-examination, Mrs. Flores admitted that she had told investigator Garcia that the day and date were Tuesday, December 6, because that was the *first day* Petitioner missed work that week. *Id.*, at 381–382, 384. Her handwritten statement given to investigator Garcia was placed in evidence. *Id.*, at 384, 389–390; Def. Exh. 10. Mrs. Flores attempted to reconcile her two stories by claiming that Jennifer might have stayed at Petitioner's house two nights in a row.[57] *Id.*, at 384, 385–387.

---

**54.** As stated *supra,* in footnote 53, the trial judge had instructed Jennifer to avoid hearsay. R. XIII 319–320.

**55.** State Exhibit 6 is a revolver in a carrying case which was taken from the Haney house by Petitioner on December 7, 1983, according to Pedro Luevanos. R. XII 129–131. When Petitioner and Luevanos got to the Quik 'N Easy convenience store, Luevanos kept State Exhibit 6 and took it to his house where he hid it in the back seat of an old car before burying it in his backyard. *Id.*, at 133–136, 139–142, 146–147. After Luevanos' arrest, he took the police to his house where they dug up State Exhibit 6. R. XIII 512–515. Thus, Petitioner could not have

had State Exhibit 6 in his trailer on the afternoon of December 7, 1983.

**56.** Petitioner could not have seen anything through this window because it was frosted. *See supra,* footnote 49.

**57.** According to Jennifer, she did not stay at Petitioner's house two nights in a row. She stated that the sequence was as follows: one night she stayed at her house; the next night she stayed at Petitioner's trailer and saw blood on Petitioner's shirt and hands; the third night she and Missy stayed at Jennifer's house. R. XIII 352.

### 4. Petitioner's Claims

Petitioner argues that Mr. Weiser should have done four things in response to Jennifer's and Mrs. Flores' testimony: (1) request a continuance, (2) interview and use the testimony of Petitioner's daughters to rebut the testimony of Jennifer and Mrs. Flores, (3) use Cecil Ming's notes or testimony to impeach the testimony of Jennifer and Mrs. Flores, and (4) use Dr. Walker's general testimony concerning the suggestibility of children. Pet's Post–Hearing Memo., Dkt. No. 74, pp. 120–128.

Before discussing these points, it should be noted that Mr. Weiser did nothing concerning Jennifer's story from the time Mr. Ming discovered her on June 1, 1984 to the State's disclosure that it had discovered her on June 18, 1984. Tr. IV 990–993. He clearly, and understandably, was trying to keep the lid on so that the State would not find Jennifer. *Id.*, at 990. And he did not want to do anything to draw attention to Jennifer. *Id.*, at 990–991. Specifically, Mr. Weiser did not send Cecil Ming to Canutillo because this activity might arouse attention in Jennifer. *Id.* His other specific reason for doing nothing cannot withstand scrutiny. Mr. Weiser did not talk to Dr. Walker during this time because he would have had to submit a voucher for the doctor which would have tipped off the prosecutors. *Id.*, at 990. The problem with this reason is that the attorney's voucher was usually submitted after trial, as it was in this case. Exh. P–67. Submitting a bill for Dr. Walker after trial would not have provided a pre-trial or during-trial tip-off to the prosecutors.[58]

As indicated above, keeping the lid on was a valid goal. However, pursuit of this goal would not have prevented Mr. Weiser from interviewing Petitioner's daughters, who were living in California, or discussing the case with Dr. Walker. Once the State discovered Jennifer, it was incumbent on Mr. Weiser to do something in response.

He had two winning responses at his disposal: one he knew about, Cecil Ming's testimony, and the other he did not know about, the testimony of Petitioner's daughters.

### a. *A Continuance*

In 1984, continuances after the beginning of trial were governed by Article 29.13 of the Texas Code of Criminal Procedure (Vernon 1966), which allowed for a continuance when, "by some unexpected occurrence since the trial began, which no reasonable diligence could have anticipated, the [defendant was] so taken by surprise that a fair trial [could not] be had." In all probability, Mr. Weiser would not have gotten a continuance because, although he learned late in the game that Jennifer was going to testify, he was not surprised by the substance of her testimony. *Quinones v. State,* 592 S.W.2d 933, 942 (Tex.Crim.App.1980) *(en banc ); Pelham v. State,* 664 S.W.2d 382, 384–385 (Tex.App.—Amarillo 1983, *pet. ref'd ); Holland v. State,* 622 S.W.2d 904, 906 (Tex.App.—Ft. Worth 1981); *cf., Quinones,* 592 S.W.2d at 945–946 (defendant may have been entitled to a continuance based on the State's discovery, right before he testified, that the victim of an extraneous offense was able to identify the defendant). Moreover, the granting of a continuance was within the trial court's discretion. *Hightower v. State,* 629 S.W.2d 920, 926 (Tex.Crim.App. [Panel Op.] 1981); *Quinones v. State,* 592 S.W.2d 933, 942 (Tex. Crim.App.1980) *(en banc ); Cooper v. State,* 509 S.W.2d 565, 567 (Tex.Crim.App. 1974); *Pelham v. State,* 664 S.W.2d 382, 384 (Tex.App.—Amarillo 1983, *pet. ref'd );* and *Holland v. State,* 622 S.W.2d 904, 906 (Tex.App.—Ft. Worth 1981).

Because Mr. Weiser did not overlook a legal advantage to which Petitioner was entitled, Mr. Weiser's failure to request a continuance does not constitute deficient performance.[59] *Thomas v. Lynaugh,* 812

---

**58.** The problem with submitting a post-trial bill for Dr. Walker was that the trial judge may not have approved the expenditure of funds for the doctor's time if Jennifer had not been called by the State and if Dr. Walker's name had not been mentioned at trial. Tex.Code Crim.Proc.Ann.

art. 26.05 § (1)(d) (Vernon 1989) (amended 1987; *see* Historical Note for 1981 version).

**59.** Mr. Weiser's reasons for not requesting a continuance were these: (1) if he requested a continuance, he would lose his argument that

F.2d 225, 229–230 (5th Cir.), *cert. denied,* 484 U.S. 842, 108 S.Ct. 132, 98 L.Ed.2d 89 (1987); *cf., Vela v. Estelle,* 708 F.2d 954, 961–965 (5th Cir.1983), *cert. denied sub nom. McKaskle v. Vela,* 464 U.S. 1053, 104 S.Ct. 736, 79 L.Ed.2d 195 (1984) (defense attorney's failure to make the proper objections to testimony and the prosecutors' argument revealed ignorance of the law and constitutes deficient performance).

### b. *Interview, and Use the Testimony of, Petitioner's Daughters*

Mr. Weiser testified that he did not interview Petitioner's daughters although he considered calling them to testify.[60] Sealed Tr. VII 46–47. However, he could not remember why he did not have them testify. *Id.* Generally, he opposed the use of children testifying against children because of his belief that the first child's testimony, in this case Jennifer's testimony, would be amplified. *Id.,* at 47. In addition, he would not use a child's testimony unless the child had information that was of striking value to his client. *Id.* Testimony from Petitioner's daughters meets this criteria.

Jennifer came out of nowhere and her mother put her up to it and (2) during a continuance, the State might find Raejeanne whose testimony conflicted with Carreon's alibi testimony. Tr. IV 1052–1053, 1071–1072. Neither reason can withstand inspection.

Although Mr. Weiser did argue to the trial judge that Jennifer's testimony should be suppressed or a mistrial granted, because she had come out of nowhere, the judge was not persuaded by it and allowed her to testify. R. XII 18–23, 34–36, 43, 294. Thereafter, the defense attorneys did not repeat this argument to the jury. R. XV 1055–1066 (Mr. Calhoun), 1066–1082 (Mr. Weiser). Nor did appointed appellate counsel use it on appeal. State Appeal Recs., Brief for Appellant, filed 11/25/86; Appellant's Mot. for Reh'g filed 4/16/87; Exh. P–106, p. 5 & Attachs. P, R. Furthermore, Texas law in 1984 did not support this reason. Contrary to Mr. Weiser's thinking, it was his failure to request a continuance, not a request for a continuance, that waived any error on appeal based on surprise. *Lindley v. State,* 635 S.W.2d 541, 544 (Tex.Crim.App. [Panel Op.] 1982).

Regarding Mr. Weiser's second reason, the State did not need a continuance to find Raejeanne. Investigator Garcia obtained a statement from her on June 13, 1984, five days

Had he interviewed Petitioner's daughters, either before or after the State found Jennifer,[61] Mr. Weiser would have discovered the following valuable testimony. Kathy and Missy Garcia would have testified that they never saw Petitioner come home with blood on his clothes or hands, although sometimes he had chili powder on his clothes from work. Tr. V 1467–1468; Exh. P–87 (Kathy); Tr. V 1635–1636, 1637 (Missy). Neither of them ever saw Petitioner with a gun or any kind of weapon. Tr. V 1469; Exh. P–87 (Kathy); Tr. V 1637 (Missy). Both would have testified that Jennifer could not have stayed at their house on the night of December 7, 1983 because that was a school night and their parents had a rule prohibiting friends from staying over on a school night. Tr. V 1464–1465 (Kathy); Tr. V 1634–1635; Exh. P–88 (Missy). In response to Mrs. Flores' claim that Jennifer might have stayed at Petitioner's house two nights in a row, Kathy and Missy would have testified that their parents also had a rule prohibiting their friends from staying over two nights in a row. Tr. V 1465–1466 (Kathy); Tr. V 1635; Exh. P–88 (Missy). Both daughters would have testified that Jennifer had a reputation for telling lies.[62] Tr. V 1458–

before trial on the merits began on June 18, 1984. R. XII 20–21; Def. Exh. 5.

**60.** Petitioner's daughters confirm that they never talked to defense attorneys before or during Petitioner's trial. Tr. IV 1295, 1298; Exh. P–89 (Teresa); Tr. V 1455–1456; Exh. P–87 (Kathy); Tr. V 1631; Exh. P–88 (Missy); *see also,* Tr. V 1511 (Janet Macias).

**61.** If Mr. Weiser had interviewed Petitioner's daughters after the State discovered Jennifer, the time for the interviews and the children's travel to El Paso would have been from the morning of Monday, June 18, 1984, to the afternoon of Thursday, June 21, 1984, when the State rested. R. XII 2, 19–20; R. XIV 733, 852, 950. Teresa was the only one of Petitioner's children who came to El Paso during his trial. Exh. P–97, p. 3. However, she arrived in time for the sentencing phase (*Id.;* Tr. IV 1297) which began on Monday, June 25, 1984 (R. XVI 2, et seq.).

**62.** This testimony was admissible to impeach Jennifer. *Cook v. State,* 646 S.W.2d 952, 952–953 (Tex.Crim.App.1983) (*en banc*); *Hill v. State,* 608 S.W.2d 932, 934–935 (Tex.Crim.App. [Panel Op.] 1980). However, specific instances of lying, such as those offered through the testimony

1463, 1489–1491; Exh. P–87 (Kathy); Tr. V 1632–1634; Exh. P–88 (Missy).

Missy would have testified that Jennifer could not have seen Petitioner wash blood off his hands in the bathroom sink because, from the hallway, the most she could have seen was Petitioner's back.[63] Exh. P–88. The only other opening to the bathroom was a window which was very high on the wall. *Id.* One would have to stand on something outside to get high enough to see through the window. *Id.* Moreover, you could not see through the window because it was frosted.[64] *Id.*

The question is whether Mr. Weiser's failure to interview Petitioner's daughters was "reasonable." *Bouchillon v. Collins,* 907 F.2d 589, 596 (5th Cir.1990); *Profitt v. Waldron,* 831 F.2d 1245, 1248 (5th Cir. 1987). There was no reason not to check Jennifer's story with Petitioner's daughters. *See Bouchillon v. Collins,* 907 F.2d 589, 596 (5th Cir.1990); (there was no advantage to be obtained by abandoning the one available defense). As stated above, talking to the daughters, who lived in California, would in no way have tipped off the prosecutors as to the existence of Jennifer. Mr. Weiser did not offer this reason as his excuse.

What he did offer, his general opposition to the use of children as witnesses, does not constitute a tactical or strategic decision because those kinds of decisions must be based on the specific facts of a case, not on a general policy. *Crisp v. Duckworth,* 743 F.2d 580, 587 (7th Cir.1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985); *see also, Bouchillon v. Collins,* 907 F.2d 589, 597 (5th Cir.1990). General policies cannot be used to justify trial decisions. *Crisp,* 743 F.2d at 587. With no justification for the failure to interview Petitioner's children, this failure

constituted an abdication of Mr. Weiser's responsibility to Petitioner. *Nealy v. Cabana,* 764 F.2d 1173, 1178 (5th Cir.1985). Had Mr. Weiser interviewed Petitioner's daughters, he would have discovered very valuable and useable evidence. Thus, his failure to interview, and use the testimony of, Petitioner's daughters constituted deficient performance. *Bouchillon v. Collins,* 907 F.2d 589, 596–597 (5th Cir.1990); *Profitt v. Waldron,* 831 F.2d 1245, 1248–1249 (5th Cir.1987); *Nealy v. Cabana,* 764 F.2d 1173, 1177, 1178 (5th Cir.1985); *Crisp v. Duckworth,* 743 F.2d 580, 584 (7th Cir. 1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985).

Prejudice is clear. Jennifer's testimony was devastating. Thus, any damage to her testimony or credibility, in all "reasonable probability," would have made a difference in the outcome. *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984); *Harris v. Reed,* 894 F.2d 871, 879 (7th Cir.1990); *Nealy v. Cabana,* 764 F.2d 1173, 1179–1180 (5th Cir. 1985). The jury's difficulty in reaching a verdict supports this finding of prejudice. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Blackburn v. Foltz,* 828 F.2d 1177, 1178, 1186 (6th Cir.1987), *cert. denied,* 485 U.S. 970, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988); *Woodard v. Sargent,* 806 F.2d 153, 157–158 (8th Cir.1986).

### c. *Failure to Use Cecil Ming*

Without a continuance and without additional investigation, Mr. Weiser could have used Cecil Ming to impeach the testimony of Jennifer and her mother. First, he could have cross-examined them as to whether, on June 1, 1984, they told Mr. Ming what his notes indicate they said. *Haynes v. State,* 627 S.W.2d 710, 712–713 (Tex.Crim.

---

**63.** This statement is consistent with investigator Freddie Bonilla's testimony. *See* Tr. III 868–873, 881–882; Exh. P–93, p. 4 (diagram of Petitioner's trailer).

**64.** Missy's statements about the bathroom window are consistent with the photographs and information obtained by investigator Freddie Bonilla. *See supra,* footnote 49.

of Kathy and Missy (Tr. V 1458–1463, 1489–1491 (Kathy); Tr. V 1632–1634; Exh. P–88 (Missy)), were not admissible. *Hicks v. State,* 630 S.W.2d 829, 836 (Tex.App.—Houston [1st Dist.] 1982, *pet. ref'd); cf., Wallace v. State,* 501 S.W.2d 883, 885 (Tex.Crim.App.1973) (a character witness, on cross-examination, could be asked "have you heard" questions concerning specific acts of misconduct).

App.1982); *Ringer v. State*, 577 S.W.2d 711, 716 (Tex.Crim.App. [Panel Op.] 1979); *Thrash v. State*, 500 S.W.2d 834, 835–836 (Tex.Crim.App.1973). If they denied having made any of their statements, Mr. Ming could have testified as to the contents of those statements. *Id.*

This procedure would have disclosed the following highly valuable evidence. In a little over two weeks, Jennifer's story changed significantly. Her story to Mr. Ming began with a dog chase; whereas, her story at trial ended with a dog chase. To Mr. Ming she said that her dog got loose one day and she and Missy Garcia chased it to Petitioner's trailer.[65] Exh. P–33A. While on the porch of Petitioner's trailer looking for her dog, she peered through the bathroom window and saw Petitioner washing blood off his hands, his shirt, and a gun. *Id.* Mr. Ming could have testified that it was impossible to see through the bathroom window from the outside of the trailer. Exh. P–85; Exh. P–139. Thus, Mr. Weiser could have argued that someone, possibly her mother, conveyed to Jennifer that her story for trial had to be different. And it was. At trial, Jennifer claimed to be inside the trailer peering through the open bathroom door while Petitioner washed blood off his hands. R. XIII 338–339, 341. Then Jennifer left the trailer to chase her dog. *Id.*, at 330–331.

Mr. Ming would also have been of great benefit regarding the testimony of Mrs. Flores. She told him the following facts which were not brought out at trial. Jennifer was "very imaginative"[66] and Mrs. Flores did not always know where Jennifer learned all of the things she said. Exh. P–33A. The first time Mrs. Flores heard Jennifer's story was on June 1, 1984, when Jennifer called her mother to tell her that she had just talked to an investigator. *Id.* This evidence would have provided fertile ground for a number of defense arguments concerning the improbability of Jennifer's story, including one based on the six-month lapse between December 7, 1983 and June 1, 1984, when Jennifer revealed, for the first time, her version of what occurred on December 7, 1983.

Thus, Mr. Weiser could have done severe damage to Jennifer's and her mother's devastating testimony by using information he held in his hands when they testified. There is no justification, from him or any other source, for his failure to do so.[67] His decision not to use Mr. Ming gained Petitioner nothing and allowed devastating testimony to stand unchallenged. *See Bouchillon v. Collins*, 907 F.2d 589, 596 (5th Cir.1990) (there was no advantage to the decision to forego the sole defense); *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir.1987) (there was no advantage to the decision to forego the sole defense); *Nealy v. Cabana*, 764 F.2d 1173, 1178 (5th Cir. 1985) (attorney had no viable reasons for his failure to interview witnesses). Thus, his failure to use Mr. Ming constituted deficient performance. *Id.*

Again, prejudice has been shown. Because Mr. Ming's testimony would have

---

65. Jennifer also told Mr. Ming that Petitioner does not like dogs. Exh. P–33A. However, at trial she said that she brought her dog to Petitioner's trailer when she stayed over night. R. XIII 324.

66. *See supra,* footnote 50.

67. Petitioner says that Mr. Weiser did not use Mr. Ming because disclosure of Ming's conversation with Jennifer would *destroy Mr. Weiser's* claim that Jennifer was a surprise. Pet's Post–Hearing Memo., Dkt. No. 74, p. 126. A review of Mr. Weiser's testimony discloses that he did not discuss, nor was he asked, his reasons for not using Mr. Ming. Tr. IV 952–1074; Sealed Tr. VII 2–77. Although this reason is the only one imaginable for the failure to use Mr. Ming, this court cannot find that this was Mr. Weiser's

reason because courts are not allowed to construct reasons for an attorney's decisions. *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir.1990). As stated in the text, the failure to use Mr. Ming gained the defense nothing. This failure did not cover up the fact that Ming had interviewed Jennifer. The court knew, or strongly suspected, that she had spoken with Ming before she testified in the presence of the jury. R. XIII 318–319. And, the failure to use Mr. Ming did not preserve the "surprise" argument for appeal. That goal would have been accomplished by asking for a continuance, which Mr. Weiser did not do. *Lindley v. State*, 635 S.W.2d 541, 544 (Tex.Crim.App. [Panel Op.] 1982). *See supra,* footnote 59.

damaged Jennifer's and her mother's testimony, there is a "reasonable probability" that presentation of Mr. Ming's testimony would have resulted in a different outcome. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984); *Harris v. Reed*, 894 F.2d 871, 879 (7th Cir.1990); *Nealy v. Cabana*, 764 F.2d 1173, 1179–1180 (5th Cir.1985). The fact that the jury had difficulty reaching a verdict supports this conclusion. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *Blackburn v. Foltz*, 828 F.2d 1177, 1178, 1186 (6th Cir.1987), *cert. denied*, 485 U.S. 970, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988); *Woodard v. Sargent*, 806 F.2d 153, 157–158 (8th Cir.1986).

d. *Failure to Use Dr. Walker's Generic Testimony*

■ As stated above, as a result of the trial court's ruling prohibiting Dr. Walker from observing Jennifer, the only subject regarding which Dr. Walker could have testified was the suggestibility of children in general. Mr. Weiser offered two reasons for his failure to call Dr. Walker: (1) the prosecutor would have argued that Dr. Walker's testimony did not pertain to Jen-

nifer because the doctor was not allowed to observe her [68] and (2) by not calling Dr. Walker, the issue of the admissibility of his testimony was preserved for appeal. Tr. IV 1041.

Considering the second reason, Mr. Weiser was wrong in asserting that he had preserved the issue for appeal. In order to do that, he had to first obtain a ruling from the trial court excluding Dr. Walker's generic testimony. *Adams v. State*, 577 S.W.2d 717, 720 (Tex.Crim.App.1979) (*en banc*); *see also, Stevens v. State*, 671 S.W.2d 517, 521 (Tex.Crim.App.1984) (*en banc*); *Lewis v. State*, 664 S.W.2d 345, 349 (Tex.Crim.App.1984) (*en banc*). Mr. Weiser never requested such a ruling. *See* R. XV 960–990. If the court had excluded Dr. Walker's testimony, in order to preserve error Mr. Weiser would have had to place the doctor's testimony in the record outside the presence of the jury or make an offer of proof. Tex.Code Crim.Proc.Ann. art. 40.09 § 6(d)(1) (Vernon 1979) (repealed 1986); *Stein v. State*, 514 S.W.2d 927, 930 (Tex.Crim.App.1974). Neither of these steps was taken. Therefore, preserving for appeal the question of the admissibility

**68.** Petitioner argues that, although Dr. Walker was not allowed to observe Jennifer, he could have provided testimony specific to her suggestibility based on some things she said to Mr. Ming and at trial. Pet's Post–Hearing Memo., Dkt. No. 74, pp. 127, 272–273. For this purpose, Petitioner relies on the testimony of Dr. Ceci, a psychologist whose expertise was offered in lieu of that of Dr. Walker who died after Petitioner's trial. Tr. III 893–939. Dr. Ceci pointed to some examples of Jennifer's suggestibility and concluded that these examples "strongly indicate that, much more so even than other children of her age, she was susceptible to suggestion and had a strong desire to please adult authority." Exh. P–84, p. 8.

One example cited by Dr. Ceci occurred when Mr. Ming asked Jennifer if Petitioner's shirt was solid blue and Jennifer responded, "Yes, thats [sic] what it was solid blue." Exh. P–33A; Exh. P–84, p. 8. Then, when Mr. Ming said, "Are you shure [sic] the shirt didn't have a check pattern in it," Jennifer replied, "Yes, thats [sic] it, it had a large check in it." *Id.* Another example occurred during Mr. Ming's questioning concerning the time of day that Jennifer saw Petitioner walk into the desert. At first Jennifer said, "Oh it was nearly dark, around 6 oclock [sic] I guess." Exh. P–33A; Exh. P–84, p. 8. When

Mr. Ming asked whether the events occurred in the afternoon, Jennifer said, "Yes I guess it was around 2 or 3 oclock [sic]. I just got home from school, yes I think it was 2 or 3 oclock [sic]." *Id.* Dr. Ceci also cited the following example of Jennifer's trial testimony as evidence of her suggestibility. Jennifer testified that the gun she saw in Petitioner's possession on December 7, 1983 was "like a BB gun, but it wasn't a BB gun." R. XIII 328; Exh. P–84, p. 9. When she was shown State Exhibit 6, a revolver, she not only said that Petitioner's gun looked like it, but suggested that State Exhibit 6 was the gun Petitioner had on December 7, 1983. R. XIII 328–329; Exh. P–84, p. 9.

Although this expert testimony would have addressed Jennifer's suggestibility and thus, would have precluded the prosecutor's argument mentioned in the text, this testimony also would have emphasized the impeachment nature of Dr. Walker's testimony, thereby bringing his testimony more obviously within the law prohibiting the use of an expert to impeach a witness's testimony. *Hopkins v. State*, 480 S.W.2d 212, 217, 220–221 (Tex.Crim.App.1972); *see also, James v. State*, 546 S.W.2d 306, 311 (Tex.Crim.App.1977); *Welch v. State*, 677 S.W.2d 562, 564 (Tex.App.—Eastland 1984, *pet. ref'd*). *See text, infra,* for discussion of State law on this subject.

of Dr. Walker's testimony was not accomplished by the failure to call him.

Considering Mr. Weiser's first reason, Dr. Walker's absence did succeed in preventing the prosecutor from making the anticipated argument. The question is whether giving up Dr. Walker's testimony in order to prevent the prosecutor's argument was a "reasonable" decision in light of the facts then known to Mr. Weiser. *Strickland v. Washington*, 466 U.S. 668, 686–89, 690, 104 S.Ct. 2052, 2064–65, 2066, 80 L.Ed.2d 674 (1984). Petitioner argues that it was not reasonable because the value of Dr. Walker's generic testimony was too great to abandon. Pet's Post–Hearing Memo., Dkt. No. 74, p. 127. Whatever the outcome of this dispute, another factor resolves the question of whether Mr. Weiser's failure to call Dr. Walker was a "reasonable" decision. That factor is the inadmissibility of Dr. Walker's testimony under Texas law in 1984.

▪ Expert testimony was admissible if three factors were met: (1) the expert was qualified to testify; (2) the subject was one on which expert testimony would assist the jury; and (3) the expert could not state a legal conclusion. *Hopkins v. State*, 480 S.W.2d 212, 218 (Tex.Crim.App.1972); *Perez v. State*, 653 S.W.2d 878, 882 (Tex. App.—Corpus Christi 1983, *pet. ref'd*); *Hollomon v. State*, 633 S.W.2d 939, 945 (Tex.App.—Austin 1982, *pet. ref'd*). It is likely that Dr. Walker and his testimony would have passed these three tests. *Perez*, 653 S.W.2d at 882; *Hollomon*, 633 S.W.2d at 945–946. The problem was that Texas law prohibited the use of an expert to impeach the testimony of a witness. *James v. State*, 546 S.W.2d 306, 311 (Tex. Crim.App.1977); *Hopkins*, 480 S.W.2d at 217, 220–221; *Welch v. State*, 677 S.W.2d 562, 564 (Tex.App.—Eastland 1984, *pet. ref'd*). In all probability, Dr. Walker's testimony would have been placed in this category and thus be deemed inadmissible.[69] *Hopkins*, 480 S.W.2d at 217, 220–221 (trial court correctly precluded the expert from testifying about the "competency" and

"credibility" of a State witness because expert testimony is not admissible for impeachment purposes); *see also, James v. State*, 546 S.W.2d 306, 311 (Tex.Crim.App. 1977); *Welch v. State*, 677 S.W.2d 562, 564 (Tex.App.—Eastland 1984, *pet. ref'd*).

Mr. Weiser's failure to offer Dr. Walker's inadmissible testimony does not constitute deficient performance. *Thomas v. Lynaugh*, 812 F.2d 225, 229–230 (5th Cir.), *cert. denied*, 484 U.S. 842, 108 S.Ct. 132, 98 L.Ed.2d 89 (1987); *cf., Vela v. Estelle*, 708 F.2d 954, 961–965 (5th Cir.1983) *cert. denied sub nom., McKaskle v. Vela*, 464 U.S. 1053, 104 S.Ct. 736, 79 L.Ed.2d 195 (1984) (defense attorney's failure to make proper objections to testimony and the prosecutors' argument revealed ignorance of the law and constitutes deficient performance).

## III. INEFFECTIVE ASSISTANCE OF COUNSEL AT THE SENTENCING PHASE OF TRIAL

### A. *The Texas Death Penalty Statute*

The Texas Death Penalty Statute in effect in 1984 required the jury that found Petitioner guilty of capital murder also to hear the sentencing evidence in a separate hearing. Tex.Code Crim.Proc.Ann. art. 37.-071(a) (Vernon 1981). After hearing this evidence, the jury was required to answer "yes" or "no" to the following two questions:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result"; and

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex.Code Crim. Proc.Ann. art. 37.071(b) (Vernon 1981); R. XVI 190–191. A "yes" answer to both questions resulted in imposition of the death penalty. Tex.Code Crim.Proc.Ann. art. 37.071(e) (Vernon 1981). A "no" answer to either question resulted in a sentence of life in prison. *Id.*

---

**69.** Petitioner admits that the purpose of Dr. Walker's testimony was to impeach Jennifer's testimony. Pet's Post–Hearing Memo., Dkt. No. 74, p. 283.

## B. *Evidence Presented at the Sentencing Phase*

The jury reached its guilty verdict at approximately 3:15 p.m. on Sunday, June 24, 1984. R. XV 1137–1138. After the verdict was announced, Mr. Weiser requested a one-hour recess during the sentencing phase the next day "before the Defense [sic] puts on their case ... if there is a defense to put on." *Id.*, at 1143. Mr. Weiser stated that he needed this time to talk to Petitioner and his wife. *Id.*

The sentencing phase began the next day, Monday, June 25, at 8:35 a.m. R. XVI 2. When the State rested just before 1:00 p.m., the court recessed for lunch until 2:55 p.m. *Id.*, at 139–140. Thus, Mr. Weiser had two hours at lunch time to talk to Petitioner and his wife.[70]

The State's evidence consisted of testimony concerning the Kolenberg crime, discussed in Part II.B.2. above, and Petitioner's 1972 felony conviction in California for attempted robbery. R. XVI 43–44, 52, 60–139. The evidence regarding this conviction disclosed that Petitioner was found to be a drug addict and was civilly committed to the California Rehabilitation Center (hereinafter CRC). *Id.*, at 46. He was in and out of this facility until his sentence expired in 1979. *Id.*, at 46, 57.

Mr. Weiser then put Petitioner and his wife, Janet, on the stand. Janet's direct examination was very brief. R. XVI 140–143. She said that two of Petitioner's brothers were murdered and, although Petitioner knew the perpetrators, he did not attempt revenge. *Id.*, at 142. She had known Petitioner for eleven years and had been married to him seven years. *Id.*, at 140, 142–143. Petitioner was a good father to their child, Teresa, and Janet's other three children. *Id.*, at 141, 142. She believed that Petitioner could not deliberately take someone's life. *Id.*, at 143. On cross-examination, which was also brief, Janet was asked about Petitioner's whereabouts after the Kolenberg crime and the events

leading to his arrest for Robert Haney's murder. *Id.*, at 143–146.

In his direct examination, Petitioner denied involvement in the Haney murders and the Kolenberg crime and explained that during the commission of the latter, he was in Corona, California purchasing heroin with a friend. *Id.*, at 147, 149–150, 150–151, 155. He also stated that, when he was young, his best friend was an 80–year–old man named Frenchie. *Id.*, at 152–153. On cross-examination, Petitioner admitted that in 1972 he was arrested for two attempted robberies, both having been committed on the same day. *Id.*, at 157–163. He pled guilty as a prerequisite to receiving a sentence in the CRC. *Id.*, at 163. From 1972 to 1979, he was in and out of the CRC a number of times, including a voluntary recommitment in December 1973 when he sought help because he had begun taking heroin again. *Id.*, at 163–167. Cross-examination also disclosed that he was arrested for burglary after he took meat from a grocery store in Riverside, California in 1981. *Id.*, at 168–170. He was released after spending a few days in jail. *Id.*, at 169–170. Petitioner described his arrest in California after the Haney murders. *Id.*, at 176–177. Contrary to Jennifer's testimony, he never had a gun. *Id.*, at 179–180. He said that Luevanos had not told the truth. *Id.*, at 181. And he admitted talking to certain inmates in the jail about his case. *Id.*, at 182–184.

The sentencing-phase evidence, arguments, and jury instructions took one day and were completed by 6:00 p.m. on June 25, 1984. R. XVI 2, 221. At that time, the jury began its deliberations. *Id.*, at 221. At 10:00 a.m. on June 26, 1984, after approximately four and one-half hours of deliberation, Petitioner's jury answered "yes" to each question. *Id.*, at 221–222, 226–228. Thus, Petitioner was sentenced to death. R. I 114 (Judgmt. dated 7/5/84).

Mr. Weiser presented a meager defense because he believed that, if Petitioner were convicted, there was nothing Mr. Weiser

---

70. At one point, Mr. Weiser said that he spent two hours preparing for the sentencing hearing but later withdrew that statement. Tr. IV 1060, 1062–1063.

could do to avoid the death penalty.[71] Tr. IV 1002–1003, 1061–1062; Sealed Tr. VII 28, 34–35, 57, 61–62. He believed that two factors assured "yes" answers to the special issues: the heinousness of the Haney murders and Petitioner's criminal record. Tr. IV 1002–1003, 1062; Sealed Tr. VII 28, 34, 61, 62. So, his preparation for the sentencing phase consisted of interviewing Petitioner and Janet and reviewing documents supplied by the State, which consisted of police reports of the Kolenberg crime and Petitioner's criminal record. Tr. IV 998–999, 1000, 1061; Sealed Tr. VII 59.

### C. Failure to Investigate and Use the Testimony of Petitioner's Family Members

At the habeas hearing in this court, Petitioner's wife, mother, and three daughters painted a picture of Petitioner much different from the one presented at the sentencing phase. Had Mr. Weiser spent more time interviewing Janet, he would have discovered a good deal of useful sentencing-phase testimony. For example, Janet described Petitioner as a "nice," "decent," and "shy" person who was a gentleman with her. Tr. V 1498, 1499, 1500. She and Petitioner became better acquainted after Petitioner found her son playing on a busy street and brought him home. Id., at 1498. During their courtship, Petitioner played with her children and brought them candy. Id., at 1499. Petitioner liked the children and they liked him. Id. During her pregnancy with Teresa, Petitioner took good care of her, doing things like making dinner for the children so that she would not be exposed to cooking odors which made her sick. Id., at 1502. Petitioner was always good to the children and showed no partiality for Teresa, his only biological child. Id., at 1535–1536. Petitioner made sure that the children did their homework and was the parent who helped them with their homework. Id., at 1536. Petitioner did housework and kept the children clean. Id., at 1536–1537.

Early in their relationship, Petitioner told Janet about his problem with heroin because he wanted to be honest with her. Tr. V 1540. Petitioner tried, on his own, to get off heroin but was not able. Id., at 1544. He also took methadone in an attempt to get off heroin. Id., at 1541–1543. He never used drugs in front of the children although he would take heroin behind the closed bathroom door. Id., at 1542. Petitioner was never abusive after taking heroin. Id., at 1543.

Petitioner cried on two occasions: when his brother, Fernando, was murdered and when Janet left him for another man in 1980. Tr. V 1506, 1526. But Petitioner was not violent on either occasion. Id., at 1502–1506, 1524. Petitioner has never hit her or the children and she has not seen Petitioner strike anyone. Id., at 1525, 1534. When Janet left with another man in 1980, all of the children chose to stay with Petitioner. Id., at 1527–1528.

An example of Petitioner's helping others began one night when Janet and Petitioner were closing the Quik 'N Easy convenience store, in Canutillo, Texas where Janet worked. Tr. V 1534–1535. A family from Juarez, Mexico was stranded at the store because the water pump in their car had broken. Id. Petitioner took them to a motel, paid for the motel, picked them up the next morning, took them to an auto parts store to purchase a water pump, and helped install a new water pump. Id.

Petitioner's mother, Isabel Macias, also could have provided valuable testimony. She would have testified that Petitioner is a good son. Tr. IV 1175. Since a young age, Petitioner has been the only one of her seven surviving children[72] who has cleaned her house and performed other household chores. Tr. IV 1179–1180. As a child, Petitioner gave his mother the money he earned from selling newspapers and clean-

---

71. See Blake v. Kemp, 758 F.2d 523, 533 (11th Cir.), cert. denied, 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985) (attorney did not prepare for the sentencing phase because he thought his client would be found not guilty of first degree murder by reason of insanity).

72. Petitioner's mother gave birth to ten children, three of whom died at young ages. Tr. IV 1195–1203.

ing yards. *Id.*, at 1177–1178. Petitioner attended church and made his first communion at age eight or nine. *Id.*, at 1188–1189. He liked to read and read an encyclopedia someone gave his mother. *Id.*, at 1188. Elaborating on Petitioner's mention of Frenchie, Isabel Macias would have disclosed that Petitioner helped clean Frenchie's yard, cook his meals, and often took Frenchie to the grocery store. *Id.*, at 1175. Frenchie trusted Petitioner to the extent that he gave Petitioner the money to pay his bills. *Id.*, at 1176. One morning after Petitioner found Frenchie on the floor of Frenchie's home, Frenchie was taken to the hospital where he died. *Id.*, at 1183. On that morning, Petitioner found Frenchie's wallet with $100 in it, gave the money and wallet to his mother, and told her to give them to Frenchie's niece. *Id.*, at 1184.

Isabel Macias could have testified that Petitioner was never violent towards her, Janet, or the children and she never saw Petitioner hit anyone. *Id.*, at 1208, 1209, 1212. In her opinion, Petitioner is not capable of committing deliberate acts of violence. *Id.*, at 1174. Petitioner's mother could have reiterated some of the things Janet said: Petitioner is a good father, plays with the children, is patient with them, and treats them all the same. *Id.*, at 1209–1211. Petitioner's mother could have elaborated on the fact that Petitioner did not seek revenge against the man who stabbed and killed his brother Fernando. *Id.*, at 1197–1199.

Petitioner's three daughters would have testified that Petitioner was not violent and very rarely spanked them. Tr. V 1470–1471, 1479 (Kathy); Tr. V 1638–1639, 1642 (Missy); Tr. IV 1307–1309 (Teresa). If Janet told Petitioner to spank the children, he would take them in the bedroom and often spank the bed rather than the children. Tr. V 1638 (Missy). Petitioner was the parent who helped the children with their homework and encouraged them to do well in school. Tr. V 1483–1484 (Kathy); Tr. V 1637, 1643–1644 (Missy); Tr. IV 1317–1318 (Teresa). He played with them and showed no favoritism for Teresa. Tr. V 1455, 1471–1472 (Kathy); Tr. V 1631, 1639 (Missy). Petitioner kissed the children at night and told them he loved them. Tr. V 1637 (Missy). The children never saw Petitioner take drugs and, before 1984, they were not aware that he took drugs. Tr. V 1482 (Kathy); Tr. V 1643 (Missy). After Janet left in 1980, Petitioner was sad and tore up all pictures of himself. Tr. V 1475–1476 (Kathy); Tr. V 1640 (Missy). The children were very happy when their parents got back together. Tr. V 1478 (Kathy); Tr. V 1641 (Missy). In Mexico, Petitioner gave all of his change to poor children and he gave money and clothes to a crazy man named Willie. Tr. V 1469 (Kathy).

Mr. Weiser admits that he did not look for this kind of evidence (Tr. IV 1004) and his failure to do so is confirmed by Petitioner's family. Although Mr. Weiser or John Calhoun spoke briefly with Janet before her testimony (Tr. V 1522–1523), no member of the defense team interviewed Petitioner's mother or his daughters (Tr. IV 1170, 1171, 1173 (Isabel); Tr. V 1455–1456 (Kathy); Tr. V 1631 (Missy); Tr. IV 1295, 1298 (Teresa)). However, Mr. Weiser would have used this testimony if he had had it. Tr. IV 1004.

Mr. Weiser opined that Petitioner's mother's testimony was the only thing that would have saved his life because Mr. Weiser saw this tactic reap success in another case. Sealed Tr. VII 58–59. At this point, he offered no reason for not presenting Petitioner's mother's testimony. *Id.*, at 58–63. In another context, he said that Petitioner did not want his mother or his wife to testify.[73] *Id.*, at 19. If Petitioner's concern for his mother was Mr. Weiser's reason for not interviewing her and using her testimony, this reason does not justify Mr. Weiser's failures. *Thomas v. Kemp,*

---

**73.** Mr. Weiser made this statement when discussing the use of Janet as an alibi witness. Sealed Tr. VII 18–22. And, he explained Petitioner's reasons for not wanting to use Janet in that capacity. *Id.*, at 18. There is no indication that Petitioner opposed the use of Janet's testimony at the sentencing phase. *See* Sealed Tr. VII 18–22. Nor was there an explanation as to why Petitioner did not want his mother to testify at the sentencing phase if, indeed, that was his position. *Id.*

796 F.2d 1322, 1324 (11th Cir.), *cert. denied*, 479 U.S. 996, 107 S.Ct. 602, 93 L.Ed.2d 601 (1986); *cf., Mitchell v. Kemp*, 762 F.2d 886, 889 (11th Cir.1985), *cert. denied*, 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987) (where petitioner repeatedly told his attorney not to use his family at the sentencing phase and contacts with petitioner's father disclosed his indifference to petitioner's case, the attorney was not required to investigate further); *Gray v. Lucas*, 677 F.2d 1086, 1093, 1094 (5th Cir.1982), *cert. denied*, 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983) (where petitioner refused to identify witnesses for the sentencing phase and "steadfastly maintained" that he did not want anyone to testify for him at the sentencing phase, his attorney was not required to investigate further). When a defendant opposes the use of his family members' testimony, the attorney needs to interview the family to determine the value of their testimony and, if it is valuable, attempt to convince the defendant of the need for their testimony. Tr. V 1376–1377; *see Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984) (the attorney's basic duties include keeping the defendant informed of important developments and consulting with the defendant on important decisions); *Mitchell v. Kemp*, 762 F.2d 886, 889 (11th Cir.1985), *cert. denied*, 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987) (the attorney must make an " '[i]nformed evaluation of potential defenses' " and conduct " 'meaningful discussion with [the defendant] of the realities of his case' "). No reason was offered for Mr. Weiser's failure to interview and use Petitioner's daughters' testimony (Tr. IV 1061) or his failure to develop more testimony from Petitioner's wife. Tr. IV 953–1073; Sealed Tr. VII 2–77.

Mr. Weiser's decision to forego investigation and use of the testimony of these family members, having been made without knowledge of what their testimony would be, was not a strategic or tactical decision; nor was it a reasonable one. *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); *Bouchillon v. Collins*, 907 F.2d 589, 596–597 (5th Cir.1990); *Harris v. Reed*, 894 F.2d 871, 877–879 (7th Cir.1990); *see Wilson v. Butler*, 813 F.2d 664, 671–672 (5th Cir.1987), *cert. denied*, 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988). Thus, these failures constitute deficient performance. *Bouchillon*, 907 F.2d at 596–597; *Harris*, 894 F.2d at 877–879; *Stephens v. Kemp*, 846 F.2d 642, 652–653 (11th Cir.), *cert. denied*, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988); *Blake v. Kemp*, 758 F.2d 523, 533 (11th Cir.), *cert. denied*, 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985).

The family members' testimony that could have been presented at the sentencing phase establishes prejudice. *Thomas v. Kemp*, 796 F.2d 1322, 1325 (11th Cir.), *cert. denied*, 107 S.Ct. 602 (1986); *see also, Stephens v. Kemp*, 846 F.2d 642, 653–654 (11th Cir.), *cert. denied*, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988). There is a "reasonable probability" that presentation of this testimony would have resulted in a life sentence. *Id.*

D. *Failure to Investigate and Use Expert Testimony and Records from the California Rehabilitation Center*

1. Expert Testimony

At the habeas hearing in this court, Dr. Cecil Whiting, an educational psychologist, testified about Petitioner's psychosocial history,[74] beginning with the fact that Peti-

---

**74.** Dr. Whiting did a good deal of investigation before testifying. He learned the nature of Robert Haney's murder. Tr. V 1657–1658. He read the transcript of the sentencing phase of Petitioner's trial and the following exhibits: P–62 containing a probation report listing Petitioner's juvenile record; P–69 consisting of Petitioner's records from the CRC; P–70, P–71, P–72, and P–73 consisting of Petitioner's school records from

Los Angeles Harbor College, Chaffey Community College, Los Angeles Community College, and public school; and P–74 containing a transcript of the preliminary hearing concerning the two attempted robberies with which Petitioner was charged in 1972. *Id.,* at 1658–1659. Dr. Whiting also read Petitioner's family members' and friends' affidavits which were attached to the original petition. *Id.,* at 1659–1660. He inter-

tioner was born with a cleft lip and cleft palate. Tr. V 1649, 1654–1655, 1662. Petitioner had his first operation to correct these problems when he was three months old and at age five, he needed another operation so that he could attend school. *Id.*, at 1663, 1674–1675. Before going to school, Petitioner did not talk; he grunted and pointed. *Id.*, at 1665–1666. Once in school, he learned to talk without speech therapy. *Id.*, at 1676. Dr. Whiting described Petitioner's neighborhood and parental home as "chaotic" and Petitioner's father as an alcoholic and "perhaps" abusive. *Id.*, at 1667. Dr. Whiting discussed Petitioner's criminal history,[75] drug addiction, and activities while in and out of the CRC from 1972 to 1979. Tr. V 1695–1698, 1705–1706, 1708, 1709–1726, 1729–1736; Tr. VI 1800–1815, 1822–1836, 1858–1859, 1865–1866; Exh. P–62, pp. 41–50 (Probation Office Report); Exh. P–69. Dr. Whiting described most of the crimes for which Petitioner has been convicted as "petty assaults" and "desperate thefts" and classified them as "junkie crimes." Tr. V 1779. However, the Kolenberg crime and the Haney murders cannot be classified as "junkie crimes." *Id.;* Tr. VI 1845. The brutality of the Haney murders indicates that they were not committed by a drug addict, which Petitioner is, but by a psychopath, which is described as someone who takes pleasure in torturing others. Tr. VI 1845–1846. There is a "very low psychological probability" that Petitioner killed the Ha-

neys or committed the Kolenberg crime. *Id.*, at 1839, 1842. And the probability of Petitioner's being a danger in the future is "very low." *Id.*, at 1853; *see also,* Tr. V 1713, 1743–1747.

■ Mr. Weiser did not investigate this "deprived childhood" defense because he thought a jury would not buy it. Tr. V 1005, 1006; Sealed Tr. VII 33–37, 67–68, 70. The problem with this reason is that an attorney's belief about juror's responses to a particular defense, even if that belief is correct, does not justify the failure to investigate that defense. *Bouchillon v. Collins,* 907 F.2d 589, 596 & n. 24 (5th Cir. 1990). The other reason why Mr. Weiser did not pursue this defense was that it would assure a "yes" answer to special issue number two, concerning future acts of violence, because this defense shows that abusive parents beget abusive children. Sealed Tr. VII 35–37; Tex.Code Crim.Proc.Ann. art. 37.071(b)(2) (Vernon 1981). However, Dr. Whiting was not asked about, and did not discuss, the theory that abusive parents beget abusive children. Tr. V 1648–1779; Tr. VI 1782–1870.

■ Although these were the major reasons why Mr. Weiser did not pursue this defense, he had an additional reason, no money. Sealed Tr. VII 35, 68, 69, 70. In 1984 when a defendant was deemed indigent, Texas law allowed payment of no more than $500 for both an investigator

viewed the following people: Petitioner's mother, father, wife, and daughters Kathy and Teresa; Petitioner's third grade teacher; the assistant principal of Petitioner's elementary school; Dr. Ruth Gitosie (correct spelling is "Gattozzi" (Exh. P–69, p. 87)) who evaluated Petitioner at the CRC; Dr. A.R. Tweed who saw Petitioner during the admission procedures at the CRC; and Pearl West, a former director of the California Youth Authority. *Id.*, at 1660–1661. He also interviewed, and administered psychological and intelligence tests to, Petitioner. Tr. VI 1782–1784.

**75.** As stated in the text, *supra,* the criminal history of Petitioner presented during the sentencing phase of his trial consisted of the following: two arrests for attempted robbery in 1972 resulting in a guilty plea to one of those robberies, an arrest for burglary in 1981, and the unadjudicated Kolenberg crime. At the

time of Petitioner's trial, the State had the following additional criminal history which was not presented to the jury: Petitioner's juvenile record, which consisted of 21 arrests from the ages of 11 to 17 with time spent in the custody of the California Youth Authority, and six arrests when Petitioner was 18 and 19 years old for disturbing the peace, being drunk, and burglary. Exh. P–62, pp. 1, 43–45. Most of these arrests were discussed by Dr. Whiting. Tr. V 1695–1698; Tr. VI 1822–1836, 1858–1859, 1865–1867. The only other mention of a crime allegedly committed by Petitioner occurs in the CRC records. Exh. P–69, pp. 74–77. In August 1976, a woman claimed that Petitioner and two other Mexican males took $80 and a gold bracelet from her and a friend at knife point. *Id.* Petitioner was not charged with this offense because the complaining witness was also a drug addict. *Id.*, at 76. This incident was discussed by Dr. Whiting. Tr. V 1736–1737.

and an expert. Tex.Code Crim.Proc.Ann. art. 26.05 § 1(d) (Vernon 1989) (amended 1987; *see* Historical Note for the 1981 version). Mr. Ming spent more than $500 worth of time for investigation alone. Exh. P–67A; Exh. P–85; Exh. P–139. Although the trial judge said that, if requested, he would consider an additional amount for investigation (R. I 16), it is highly unlikely that any El Paso court in 1984 would have authorized payment of the $11,599 that the federal government has paid Dr. Whiting for his testimony at the habeas hearing in this court. Voucher for Expert Services, Dkt. No. 89. The Texas statutory maximum and the case law strongly support this conclusion. The appointment of an expert was within the "sound discretion" of the trial court. *Quin v. State,* 608 S.W.2d 937, 938 (Tex.Crim.App. [Panel Op.] 1980). And the only way to establish an abuse of that discretion was to show harm resulting from the refusal to appoint. *Id.; Brasfield v. State,* 600 S.W.2d 288, 296 (Tex.Crim. App.1980) *(en banc); Freeman v. State,* 556 S.W.2d 287, 302–303 (Tex.Crim.App. 1977).

Had Mr. Weiser made a request of $12,-000 to obtain this kind of expert testimony, his request would have been denied. An attorney's performance cannot be labeled deficient for failing to make a request which would have been denied. *See Smith v. Puckett,* 907 F.2d 581, 585 n. 6 (5th Cir.1990). However, a substantially pared down financial request probably would have obtained court approval. Whether such a request would have purchased testimony comparable to that of Dr. Whiting is another question. Nevertheless, a denied request for this kind of testimony would have set up a claim under the soon-to-be-decided case of *Ake v. Oklahoma,* 470 U.S. 68, 86, 105 S.Ct. 1087, 1098, 84 L.Ed.2d 53 (1985), that Petitioner was denied due process by the State's failure to pay for this expert testimony.

2. Petitioner's CRC Records

Lack of money did not prevent Mr. Weiser from obtaining copies of Petitioner's CRC records.[76] He could have discovered these records by mailing a letter or making a phone call, both of which entail a meager expenditure of funds.[77] Tr. V 1374–1375. These records are of enormous significance for one reason: they strongly support a "no" answer to special issue number two because, as discussed below, they show that Petitioner committed no acts of violence while in the structured environment of the CRC.[78] Exh. P–69. These records provide facts from which Mr. Weiser could have argued that, if Petitioner were sentenced to life in prison, the likelihood of his committing acts of violence was nil.[79] And, these records would have prevented the prosecutor from arguing that Petitioner would be a menace to other inmates in prison.[80] R. XVI 217.

Petitioner's CRC records disclose that, from 1972 to 1979, he was written up only twice for violating the institution's rules.

---

**76.** Nor would lack of money have prevented Mr. Weiser from obtaining Petitioner's records while in the custody of the California Youth Authority. But these records were unavailable in 1984 because they had been destroyed by that time. Tr. VI 1814–1815. Although the California Youth Authority facilities to which Petitioner was committed were more like a prison than the CRC facility to which he was committed, the only records showing how Petitioner behaved while in custody were the CRC records. *Id.,* at 1814–1818, 1843, 1844.

**77.** Additional funds would have been needed for the transportation, lodging, and meals of a records custodian from the CRC. Apparently these expenses would have been reimbursed since the trial court ordered payment of the same expenses for Petitioner's wife. Exh. P–67, pp. 2, 5–7, 9.

**78.** *See Franklin v. Lynaugh,* 487 U.S. 164, 174–80, 108 S.Ct. 2320, 2328–30, 101 L.Ed.2d 155 (1988) (good conduct in prison is relevant to the Texas special issue concerning future dangerousness).

**79.** During Mr. Weiser's jury argument at the sentencing phase of trial, he did not even mention a sentence of life in prison or the likelihood of Petitioner's committing acts of violence while serving such a sentence. R. XVI 203–209.

**80.** The prosecutor also argued that Petitioner might escape from prison. R. XVI 217–218. The CRC records could have been used to rebut this argument because they show that Petitioner never attempted an unauthorized leave from the facility. Exh. P–69.

Exh. P–69, pp. 28, 51. The first, which occurred on February 13, 1973, involved Petitioner's possession of prison contraband. *Id.*, at 28. A barber's comb and two nickels were found on his person. *Id.* Petitioner's locker contained 18 library and educational books, five extra pairs of pants, two "sling shot type t-shirts," and numerous pieces of upholstery material. *Id.* Petitioner was a phone monitor for a dormitory at that time and attached to his clipboard was a tattoo pattern. *Id.* Petitioner's punishment was that he discuss this infraction in a group session for two mornings. *Id.* Petitioner's second rules violation occurred on October 21, 1974. *Id.*, at 51. He was charged with violating a rule regarding tattoos and possessing contraband connected with the making of tattoos. *Id.* Another inmate was making a large tattoo of Jesus Christ on Petitioner's back. *Id.* The contraband consisted of a tattoo needle, six large tattoo patterns, and a bottle of India ink found in Petitioner's locker. *Id.* Petitioner admitted the charge and his punishment was 24 hours of extra duty. *Id.*

There is no indication that Petitioner committed any acts of violence while at the CRC. Exh. P–69. Indeed, the descriptions of his behavior and attitude throughout the years are complimentary. For example, he discussed his problems candidly and did not engage in games and defenses. Exh. P–69, p. 26; Tr. V 1715, 1732. He was a constructive member of the group sessions and acted in a "mature manner." Exh. P–69, p. 60. During certain periods of time he attended college all day and received satisfactory grades. *Id.* He had a positive attitude and responded well to the group process. *Id.*, at 61. His response to the staff, his peers, and the dormitory program was "excellent." *Id.*, at 83. He was "more than willing" to assist his peers and cooperate with the staff. *Id.*

Mr. Weiser admits that he did not try to obtain these or any other records. Tr. IV 1015–1016. He did not want to use any evidence that would amplify Petitioner's drug use or show how he coped with his drug addiction because he believed that all evidence of drug addiction was aggravating, rather than mitigating. Tr. IV 1026–1027; Sealed Tr. VII 39, 70–72. In addition, Mr. Weiser believed that the benefit of proving Petitioner's good behavior in the CRC would be outweighed by evidence that Petitioner was sent back to the CRC "two" times. Tr. IV 1063; Sealed Tr. VII 71–72. The problem with these reasons is that, at the sentencing phase of trial, the jury heard plenty of evidence of Petitioner's drug addiction and use.

At the sentencing phase, an Assistant District Attorney from California testified that Petitioner was sent to the CRC in 1972 because he was a drug addict and that he was in and out of the CRC until he completed his sentence in 1979. R. XVI 46, 52, 57–58. Petitioner said that he began using heroin at age 13 or 14 and later became addicted. *Id.*, at 149, 156. On cross-examination, Petitioner explained his history of numerous re-commitments to the CRC based on his continued use of heroin.[81] *Id.*, at 163–167. Thus, Petitioner's long-term problem with heroin was in the record. Ignoring it would not make it disappear.

Contrary to Mr. Weiser's belief about the aggravating nature of all evidence of drug addiction, there existed some positive ways in which Petitioner coped with his drug addiction. These positive aspects were in evidence at the sentencing phase and are confirmed by the CRC records. However, Mr. Weiser failed to mention them in his jury argument.[82] R. XVI 203–209. One was that Petitioner voluntarily returned to the CRC in December 1973 because he had begun using heroin again. R. XVI 164.

81. As stated in the text above, Mr. Weiser thought that Petitioner had been sent back to the CRC "two" times. Tr. IV 1063; Sealed Tr. VII 71–72. His recollection was incorrect. Petitioner was sent back numerous times.

82. An attorney's failure to explain to the jury how to use mitigating evidence leaves the jury with "no guidance" concerning how to apply that evidence in its sentencing decision and supports the conclusion that the defendant was prejudiced. *Stephens v. Kemp,* 846 F.2d 642, 654–655 (11th Cir.), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988).

Another was that Petitioner requested to be put in a methadone maintenance program because he was having difficulty staying away from heroin. *Id.*, at 165–166. The third was that Petitioner successfully completed the drug rehabilitation program because he was never sent to prison.[83] *Id.*, at 58–59.

The only negative pieces of information, which are in the CRC records and which were not presented during the sentencing phase, were an allegation that Petitioner and two others committed an aggravated robbery in August 1976, Petitioner's failure to report for supervision and drug testing after May 1981, and Petitioner's failure to appear in court on a 1981 burglary charge.[84] Exh. P–69, pp. 74–77, 107, 108, 110, 112–113, 119, 120. Of course, Mr. Weiser did not know of these negative factors because he did not obtain copies of these records. Nevertheless, these factors will be addressed in order to determine whether Mr. Weiser's failure to obtain and use the CRC records was reasonable.

The CRC records show that in August 1976, a female drug addict claimed that Petitioner and two other Mexican males robbed her and a friend at knife point.[85] Exh. P–69, pp. 74–77. Charges were never filed against Petitioner. *Id.*, at 76. The CRC records confirm the testimony at the sentencing phase that Petitioner successfully completed his first seven-year commitment to the CRC on June 15, 1979. *Id.*, at 107. However, because Petitioner was convicted in 1974 of illegal use of a controlled substance and possession of a controlled substance, he was committed two more times to the CRC, with his final term expiring on September 30, 1981. *Id.* He did not successfully complete this term. He last reported for supervision and drug

testing on May 20, 1981. *Id.*, at 110, 112–113. His drug test on that day was negative. *Id.*, at 110. Thereafter, he was declared a "releasee-at-large" and a parole officer asked the court to vacate the order committing Petitioner to the CRC. *Id.*, at 110, 112–113. The final result was that, because Petitioner had very little time left to serve, he was simply excluded from the CRC program. *Id.*, at 119, 120. The parole officer's letter to the court mentions that Petitioner was arrested for burglary on June 30, 1981 in Corona, California [86] and that contact with a detective in the Corona Police Department disclosed that a bench warrant had issued because Petitioner failed to appear in August 1981. *Id.*, at 113.

None of the four negative items in the CRC records—the re-commitments noted by Mr. Weiser or the items noted here, the August 1976 armed robbery, the failure to report for supervision, and the failure to appear in court—detracts from the crucial fact contained in the CRC records. Numerous re-commitments because of continued use of heroin do not affect Petitioner's record of nonviolence, and his inability to use heroin, while serving a sentence of life imprisonment. The armed robbery, which occurred while Petitioner was out of custody, does not affect his record of nonviolence while in custody. Finally, his failure to report for four months of supervision and his failure to appear in court do not impact at all on his record of nonviolence while in custody. Thus, the beneficial evidence in the CRC records strongly outweighs the detrimental evidence.

It was not "reasonable" for Mr. Weiser to fail to obtain and use Petitioner's CRC records particularly in light of the facts that he knew of Petitioner's commitments

---

**83.** Although this fact is confirmed by the CRC records (Exh. P–69, p. 107), these records also show that, with regard to Petitioner's two subsequent court-ordered CRC commitments, he failed to report for the last four months of supervision (*Id.*, at 107, 110, 112–113), as discussed in the text, *infra.*

**84.** Apparently, this is the burglary charge Petitioner discussed at the sentencing phase which was based on his taking meat from a grocery store. R. XVI 168–170. Petitioner said that he

was released after spending a couple of days in jail. *Id.*, at 170.

**85.** This offense is also discussed in footnote 75, *supra.*

**86.** The testimony at the sentencing phase of trial was that Petitioner was arrested for the 1981 burglary in Riverside, California. R. XVI 168–170.

to the CRC and that prosecutor Moody would argue Petitioner's dangerousness while in prison.[87] *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984); *see Loyd v. Smith,* 899 F.2d 1416, 1426 (5th Cir.1990) (there were a number of factors indicating the need for further investigation); *Stephens v. Kemp,* 846 F.2d 642, 652–653 (11th Cir.), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988) (look at what attorney knew that should have tipped him off to the need to investigate); Mr. Weiser's failure to obtain and use these records constitutes deficient performance. *Id.*

Prejudice to Petitioner is obvious. No evidence regarding Petitioner's nonviolent behavior while in custody was presented at the sentencing phase. R. XVI 37–185. The CRC records provided this evidence from a disinterested an unimpeachable source. There is, therefore, a "reasonable probability" that, had this evidence been presented, Petitioner would have received a sentence of life in prison. *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984); *Blake v. Kemp,* 758 F.2d 523, 534–535 (11th Cir.), *cert. denied,* 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985).

## RECOMMENDATION

It is therefore recommended that this Petition for Writ of Habeas Corpus be granted.

SIGNED and ENTERED this 26th day of April, 1991.

---

**87.** This argument could be expected from any prosecutor. However, because Mr. Weiser and Mr. Moody had worked together in the district attorney's office, their relationship gave Mr. Weiser specific information as to Mr. Moody's probable arguments. Tr. IV 955, 985, 987, 1007–1010, 1045, 1051. Mr. Weiser stated that, if he had presented evidence of Petitioner being a model prisoner, prosecutor Moody "might" have argued that such evidence should not be considered. Tr. IV 1007–1010 Mr. Weiser was not asked for Moody's argument if such evidence were not presented. Tr. IV 953–1074; Sealed Tr. VII 2–77. Nevertheless, Mr. Moody's argument was predictable.